Argued September 17; modified November 6; rehearing denied
December 20, 1946

# CLAUDE *v.* CLAUDE
(174 P. (2d) 179)

*Charles W. Swan,* of Vale (with Robert E. Lees, of Ontario, and Earl E. Garrity, of Nampa, Idaho, on brief), for respondent.

*P. J. Gallagher,* of Ontario, for appellant.

LUSK, J.

This is a divorce suit in which both husband and wife seek a dissolution of the marriage contract. The Circuit Court found both parties at fault, and, applying the ''clean hands'' doctrine, declined to grant relief to either. Both parties have appealed from the decree of dismissal.

In her complaint the wife charges her husband with cruel and inhuman treatment, consisting, among other things, of physical assaults, threats to do her bodily harm, cursing and reviling her, accusing her of having affairs with other men, and refusing to participate with her in the social and community life of Ontario, the city near which their home is located. The husband, by his answer and cross-complaint, denies her accusations of misconduct, and charges his wife with extravagance, neglect of her home, and a love affair with another man.

As to the wife's charges the Circuit Court found that for several years ''the husband has pursued a course of cruel treatment of the wife by using profane and abusive language to the wife in the presence of their children and others, often threatening to do her bodily harm and employing physical force upon and against the wife and subjecting her to physical violence, all in an apparent effort to compel the wife

to conform in all ways to the wishes and ideas of the husband.''

The court further found ''that during the latter part of July or the first part of August, 1944, the parties quarreled and the husband again visited physical violence upon the wife''.

Respecting the alleged misconduct of the wife the court found:

''That for several months prior to January, 1944, and continuing until their final separation in July or August, 1944, the wife has, with the exception of about two months immediately after March 13th, 1944, continuously associated with a man by the name of Bernard Anderson in such a manner and to such an extent that her name has been linked with that of the said Anderson in common gossip and in the vicinity of Ontario, Oregon, and that, while there is no direct evidence of improper relations between the wife and the said Anderson, yet the conduct of the wife has been such in this regard as to incite such gossip and has been unbefitting a wife and mother, and has caused the husband and older children great embarrassment and humiliation.''

The parties were married at Fresno, California, on February 19, 1924. Mrs. Claude was then fourteen years of age and her husband twenty-nine. They have four children—Louise, a daughter, twenty years of age, and, as counsel for the plaintiff inform us, married since the trial of this case; Eugene, a son, seventeen years of age; Colleen, a daughter, eight years of age; and Jacquolyn, a daughter, six years of age. For a number of years prior to their marriage the defendant had engaged in the sheep business, either on his own account or as an employee of others, and their married life began, and most of it has been spent, on a

sheep ranch in Malheur County. At the time of their marriage the defendant was worth, according to his own testimony, $8,000.00; according to hers, less than $1,000.00. Through hard work and sacrifice their affairs prospered to such an extent that today their holdings, consisting of livestock, lands, farm equipment, a house in Ontario, their home in the vicinity of Ontario, cash in bank, bonds, and other property, are worth probably in excess of $100,000.00. The defendant's estimate is between $60,000.00 and $70,000.00; the plaintiff's $150,000.00. The trial court found the value to be between $50,000.00 and $100,000.00.

Mrs. Claude worked with her husband in the lambing camps, the sheep camps, and on the ranches. In this, as the evidence indicates, she did no more than was customary among women in her station in life in the country in which she lived. Her husband, however, seems to have recognized that her labors had contributed substantially to his success, for, on June 3, 1935, he entered into a partnership agreement with her in which he acknowledged her ownership of a one-third interest in the property devoted to their livestock and farming business. Thereafter they transacted their business under the firm name of "Claude & Claude", and in that name kept bank accounts upon which they both were authorized to draw checks.

Mr. and Mrs. Claude appear not to have had any serious domestic difficulties until after 1938 when they acquired a place near Ontario, consisting of a comfortable house and sixty-eight acres of land, which is referred to in the testimony as the "ranch home". This was their home until their final separation. Mrs. Claude desired, and, we may say, was entitled to enjoy a measure of social life—something she had not had in the sheep camps of Malheur County—and to this

end she joined a number of social and fraternal organizations in Ontario. Also, she was active as a member of the War Chest Committee for Malheur County and in blood donor work. In these latter activities she became associated with Bernard Anderson, the man referred to in the Circuit Court's findings above quoted.

In January, 1944, after a quarrel, Mrs. Claude left home and went to Boise, Idaho, taking her three daughters with her. On January 28, 1944, the defendant filed suit for divorce, alleging, among other things, his wife's wrongful association with an unnamed Ontario man, evidently Anderson, and thereafter Mrs. Claude filed a cross-complaint alleging various acts of cruel and inhuman treatment. After prolonged negotiations between the parties and their attorneys they agreed to compose their differences, and, under date of March 13, 1944, entered into a written agreement for the settlement of their property rights. (In the present suit the plaintiff seeks specific performance of this agreement, and the defendant asks to have it set aside on the ground that its execution was procured by the fraud of the plaintiff.) The parties thereupon resumed marital relations, although the then pending divorce suit was not dismissed until May 12, 1944, the order of dismissal being entered pursuant to a written motion therefor signed by the parties and their attorneys and filed in court on May 10, 1944.

Not many weeks after their reconciliation the parties were quarreling again, the plaintiff having renewed her association with Anderson. She informed her husband that they could no longer live together and finally, on August 2, 1944, filed the present suit.

■ Before discussing the evidence we will dispose of a contention of the defendant that plaintiff condoned the wrongs of which she complains by continuing to cohabit with him for three days after she filed her complaint for divorce. She denies his testimony in this regard, but it is not necessary to determine what the fact is, because in this state, under our statute, § 9-911, O. C. L. A., condonation of a marital offense, except adultery, cannot be established by implication from the voluntary cohabitation of the parties after knowledge thereof, and to constitute a bar to any of the causes of divorce named in the statute except adultery the offense must have been expressly forgiven. *Saville v. Saville,* 103 Or. 117, 122, 203 P. 584. To the same effect see *Arndt v. Arndt,* 146 Or. 347, 350, 25 P. (2d) 1118, 30 P. (2d) 1.

■■ Condonation is conditional, and, where there is repetition of the offense after condonation, the condonation is to be deemed withdrawn or avoided, (*Amend v. Amend,* 135 Or. 550, 553, 296 P. 875, 76 A. L. R. 986) and, if the settlement of March 13, 1944, may be said to have amounted to express forgiveness of prior marital offenses, any repetition of such offenses by either party thereafter would have the effect of reviving the original wrong as a cause of divorce, as though there had been no condonation.

Notwithstanding Mrs. Claude's denials in her pleadings and protestations as a witness, the evidence is convincing that her relationship with Anderson went considerably beyond that of mere innocuous friendship or of coworkers in laudable community projects, and that it was the cause of the disruption of their marriage. During the month of December, 1943, according to the uncontradicted testimony of the defend-

ant, she was away from home every night except three or four, returning "all the way from twelve o'clock to three or four o'clock in the morning". She was at that time a good deal in the company of Anderson, and, while there is no direct evidence that she was spending her evenings with him, neither is there any satisfactory explanation from her as to how she was spending them. Their affair, if such it may be called, became a matter of town gossip and caused Mrs. Anderson to protest to Mrs. Claude. Her nightly absences from home continued during the month of January, 1944, until she left on January 24. The defendant took her to task, at first simply for neglecting her home and children, but finally protested to her against her continued association with Anderson.

The plaintiff testified that they quarreled immediately prior to the January, 1944, separation because of an investment by her of $1,800.00 in war bonds to which she said her husband made violent objection. When she left she withdrew about $6,000.00 from their joint checking account in the Ontario National Bank, and, on discovering this, the defendant caused a warrant to be issued for her arrest. This, we may observe in passing, was a rash and mistaken act on his part. But in this case the plaintiff seeks to make nothing of it as a ground of divorce.

On Easter Sunday, April 9, 1944, a little less than a month after their reconciliation, while the parties were at their sheep camp about eighty-seven miles from Ontario, Mrs. Claude met Anderson clandestinely and went for a boat ride with him on Owyhee Lake. The evidence leads to the conclusion that this was not a chance meeting, as the plaintiff would have us believe, but was prearranged. A letter (Exhibit B in the record), written by Mrs. Claude to Anderson on several

different days thereafter, beginning on April 14 and ending on April 23, is sufficient proof that it was a highly romantic episode. Mrs. Claude testified that she did not mail the letter. But whether she did or not seems to us to be a matter of small moment since the letter shows on its face that she intended to mail it, and, apart from that, it is her own statement of her infatuation with Anderson and contradicts all that she swore to respecting the real character of their association.

The defendant learned of his wife's meeting with Anderson shortly after it had occurred, and it was the subject of a lengthy discussion between them, though not the occasion, so far as it is possible to ascertain from the record, of an acrimonious quarrel. She promised not to see Anderson again, and she testified on direct examination that during the months of April and May, the greater part of which they spent in the sheep camp, occasional trips which she made to the ranch home were not due to any difficulties that she was having with her husband, and that their affairs were going along smoothly during that time. We quote from her testimony:

"Q Mrs. Claude, were any of these trips to town occasioned by any difficulty that you and Mr. Claude were having?

"A You mean during the month of April, May and along in there?

"Q Yes.

"A Oh, no.

"Q Your affairs were going along smoothly?

"A We were getting along with them. I was making out pretty well, that is, I was still going back and forth with him, and it wasn't due to our quarreling or anything, the reason that I came down, no."

Inconsistently with the foregoing, perhaps, the plaintiff testified, generally, that defendant's treatment of her "in the past years" had been "very violent", and related instances of such violence. One of these occurred about April 25 when the defendant objected to her paying out of their joint bank account a $500.00 fee which she owed her attorney for services rendered in the first divorce suit and its settlement. She said that when the defendant learned that she had drawn the check over his objections "he went into one of those tantrums and he stopped me from writing checks in any manner whatsoever"; and in another place in her testimony, when asked to give specific instances of violence offered her by the defendant, she said that on this occasion he "grabbed me by the shoulders, back of the head, banged me against the wall". His conduct, in her view, amounted to a breach of the property settlement agreement and convinced her that he did not intend to carry it out.

She testified in effect that there were frequent quarrels—"usually over money, sometimes something else, maybe some little minor details about the children we didn't both agree on—most any little thing that might come up in any family, little incidents that shouldn't cause any such violent quarrel, but it usually did."

She admitted, with evident reluctance, that Anderson figured to some extent in these quarrels. After the latter part of May, being convinced, as she testi-. fied, that they could not live together in peace, she began to demand what she referred to as a settlement and a separation. She wanted some property so as to have something for the children for the future, and she wanted the custody of the children. Finally, when the defendant refused to accede to her demands,

she filed her divorce complaint on August 2, 1944. They were living together at the time in the ranch home, and, after he had been served with summons in the suit, they engaged in what was no doubt a violent quarrel, in the course of which the defendant accused her of having renewed her association with Anderson. During this quarrel she testified that:

> "He grabbed me by the face. He had his hands over my glasses in such a manner that it broke the skin. I have the spot in my face yet where it broke the skin, cut my face. He banged me against the wall and called me everything—I am sure most men don't carry such a vocabulary as he does."

The defendant testified that she became hysterical, that "she lunged at me and I grabbed her and held her." He denied that he shook her, but said that he "pushed her back by the face" and "before I got any madder, I thought, well, I will walk to the mail post and get the mail. When I got back she was gone." This was the only time, according to the defendant, except once about twelve years before, that he had ever laid hands on his wife.

There can be no doubt under the evidence that Mrs. Claude had resumed her association with Anderson. There is uncontradicted evidence that during the months of April and May, 1944, Mrs. Claude and Anderson engaged in numerous telephone conversations in which they addressed each other in terms of endearment and discussed subjects far removed from war chest drives and blood donations, one such conversation having to do with a diamond ring which Anderson was proposing to buy for her.

After the plaintiff left her husband in August she moved into their house in Ontario, furnished it

with furniture which she bought through her daughter Louise from Anderson, and installed a telephone which she obtained through him. She admitted that at the time of the trial Anderson was using her automobile once or twice a week.

The defendant testified that the first time after the reconciliation that they quarreled over the Anderson matter was one night subsequent to May 25, 1944, the day they returned from the sheep camp to the ranch home. He suspected that she was engaged in a telephone conversation with Anderson and charged her with desiring to renew her relations with him. In response to her demand for a separation and division of their property he testified:

> "I kept trying to tell her that wouldn't be the thing to do; when it was sold the income tax would practically take the whole thing, it shouldn't be tore up, I had worked all my life to build it up, to make a home."

He further testified that he told her that he wanted to keep the babies together on the ranch "so that I could educate my children". Thereafter the subject was repeatedly discussed, and no doubt acrimoniously on both sides. Sometime in July he heard "rumors" of the telephone conversations above described.

Counsel for the plaintiff concede in their brief that "she has been most indiscreet in her relationship with Anderson". In extenuation, however, they call attention to the facts that she was married when but a child, and up to the time that the parties established their home near Ontario, she had known nothing but a life of toil and hardship. They say that Anderson, as the plaintiff testified, treated her as a gentleman should treat a lady and that this for her was a novel experience and one that she naturally liked.

These are considerations which cannot but excite sympathy for the plaintiff. But it must be remembered that at the time in question Mrs. Claude was a woman thirty-three years of age, with four children, the eldest a grown daughter, and already had enjoyed several years of life in Ontario. Their home near that city was comfortable, well furnished, and equipped according to modern standards. She had access to an ample bank account, which she appears to have used freely, and there is no evidence whatever that while living in the ranch home she wanted for any of the comforts of life, and apparently she had some of the luxuries. She had her own automobile and she came and went pretty much as she pleased. Her testimony indicates that she is an intelligent and ambitious woman, and there is no reason to believe that she is not fully aware of her responsibilities as a wife and mother. But her conduct with Anderson, fairly appraised, could not be otherwise than the source of humiliation and injury to her husband and of discord in the home. It was, we think, the cause of their separation in January of 1944. When the offense was repeated after their reconciliation in March, it became a greater wrong, for the resumption of the marital relationship at that time was in the full light of the disastrous effect of her previous association with Anderson and with the express understanding that it would not be renewed.

She could not but know that a course of conduct on her part which had once nearly brought an end to their marriage would, if resumed, imperil it again. And it seems to us that, with Anderson in the offing, her demands that the defendant make a division with her of the properties devoted to their common business, and agree to give her a divorce and the custody of their children—to whom, the evidence discloses,

he is as devoted as she—was, to say the least, highly unreasonable.

We think that the plaintiff was not justified in assuming—if she did so—that her husband intended not to live up to the settlement agreement because he objected to her paying her attorney out of the joint account. The agreement provided that there should be set aside in cash to the credit of the defendant the sum of $17,000.00, and the plaintiff was to receive a like sum, of which $5,000.00 was represented by war bonds and cash then in her possession, and the balance of $12,000.00 was to be paid to her on or before December 1, 1944. It was agreed that in addition to such sum of $17,000.00 the plaintiff was the owner of an undivided one-third interest in all the properties "now held, owned, or possessed by the parties or either of them"; that any surplus earnings not needed for the operation of their business should be divided between the parties once each year in proportion to their respective interests in said property; and that other than household expenses, medical attention, costs and expenses of education, all expenses and purchases should have the approval of the defendant prior to being incurred or made. The attorney's fee was not a household, medical, or educational expense. The defendant had the right under their contract to disapprove it, and it was not unreasonable for him to regard it as not a proper partnership expense or to expect that she should pay her attorney out of the $5,000.00 which she had received under the settlement agreement.

The evidence does not support the claim in plaintiff's brief that the defendant's love of money was the root of the evil in this marriage, that he was displeased because his wife had found something more

in life than the accumulation of money, and that he used Anderson as an excuse. He was not ungenerous with the plaintiff. He did, it is true, object to what he considered her extravagance. He testified, without contradiction, that in one twelve-months period she spent $6,000.00—which included the cost of a year at college for their eldest daughter—and he complained about this. Opinions might differ as to whether, considering their circumstances, he took too narrow a view of the question, but it cannot justly be said that it was misconduct on his part to endeavor to protect and safeguard the competency which had been acquired with so much toil and sacrifice.

He did not himself take part in the social and club activities which his wife found so agreeable. Probably he did not care about them. But, apart from that, his health was not good, he was suffering from the effects of a severe operation, and it would no doubt have been most difficult for him to go about at night in addition to carrying on the arduous labors of his livestock business. At any rate, we are satisfied that his alleged shortcomings in this regard were not a cause of serious dissension in the home; that he did not object to his wife's social activities and aspirations as such; but that he did object, and with reason, to the unduly prominent role which she permitted Anderson to assume in that side of her life.

The evidence of defendant's alleged physical assaults, threats, and curses remains to be considered. The plaintiff made sweeping general charges in her testimony, but told of only three specific instances of alleged assaults upon her by the defendant: the first just before their separation in January of 1944, the next about April 25, 1944, when they quarreled over the payment of her attorney's fee, and the last at the

time of their final separation. The defendant, as a witness, denied these charges, except to the extent that he admitted laying hands on her in the altercation on August 2, 1944. That occurred after she had filed her divorce suit, and could not, of course, have had anything to do with her decision to sue for divorce. The only corroboration of the plaintiff's testimony comes from her daughter Louise. She testified as a witness for her mother that she had never seen her father strike her mother, but that after her mother left home the last time she had bruises on her back and finger marks and bruises on her shoulders. She testified further that in the latter part of May, 1944, her father came home from the sheep camp and was very angry and excited and upset, that she heard them arguing all night long. She said:

"I heard the things he said. After a while you get enough of that. I couldn't take it any longer so I decided to leave."

She did not say what the quarrel was about, nor relate anything that was said in the course of it. She took her mother's part, but did not testify that she had ever heard her father threaten her mother.

It is not without significance that the complaint, as filed, does not mention acts of physical violence committed by the defendant, and that it was not until the trial that they were brought into the complaint by amendment. Neither did the plaintiff's cross-complaint in the first suit contain any such allegations. That pleading, which is in evidence, was filed on February 4, 1944, less than two weeks after the January separation. It includes a detailed account of the quarrel which preceded that separation, and charges that the defendant then threatened to shoot and kill the plaintiff. The incident must have been fresh in

the plaintiff's mind at the time the cross-complaint was prepared, and, if the defendant had assaulted her as she testified, it is difficult to believe that she would have omitted, as she did, to allege that fact as a ground of divorce.

Again, with reference to the incident of April 25, 1944, we are unable to reconcile the plaintiff's version of what occurred, including her testimony that "he grabbed me by the shoulders, back of the head, banged me against the wall", with the subsequent dismissal of the first divorce suit, pursuant to a motion, signed not only by the attorneys but by the parties as well, and to which was attached a copy of the agreement of March 13, 1944.

We are prepared to believe that the defendant lost his temper—at times under great provocation—and that his language was not always the language which a husband should use in addressing his wife. He admitted as much when testifying about their final quarrel. But the plaintiff herself, as the record shows, was not wholly deficient in the use of impolite epithets, and in their frequent and bitter verbal battles she was no doubt quite able to hold her own.

If the defendant ever threatened to shoot her or otherwise to do her bodily harm, as she testified, she could not have taken such threats seriously or experienced any real apprehension of harm (see 1 Nelson on Divorce 219, § 6.05), for, after the first separation, it was the plaintiff who sought a reconciliation. And again in January, 1945, while this suit was pending, she sought out the defendant, went for a long automobile ride with him, and asked to be taken back. He refused because, as he told her, he thought she would not give up Anderson, who had himself been divorced at the time of the trial below.

■ On disputed questions of fact it is the rule in this court to give weight to the findings of the trial judge in a suit in equity and not lightly to set them aside. We are not, however, bound by such findings, and, where the evidence is conflicting, we have a duty to examine the record with care for the purpose of determining the truth. This we have done in the present case with the result that we have reached the conclusion that the plaintiff has greatly magnified her husband's faults. We are not convinced that he offered her physical violence either in January or April, 1944, nor in their final quarrel in August of that year except to the extent that he admitted in his testimony. In so finding we have taken into consideration the fact that in parts of her testimony, particularly that relating to her relations with Anderson, the plaintiff did not always tell the truth.

■ The plaintiff's association with Anderson, long continued, renewed, and persisted in after the reconciliation with her husband, was, in our opinion, such marital misconduct as to constitute ground of divorce. It was the thing in fact which broke up their marriage. By comparison such fault as the believable evidence shows the defendant to have been guilty of is slight, and his provocation was great. In these circumstances we think the defendant is entitled to a decree of divorce. See *Fritz v. Fritz,* 179 Or. 612, 174 P. (2d) 169, this day decided; *Fuller v. Fuller,* 175 Or. 136, 140, 151 P. (2d) 979; *McElwee v. McElwee,* 171 Or. 462, 467, 138 P. (2d) 208; *Mueller v. Mueller,* 165 Or. 153, 156, 105 P. (2d) 1095; *Condit v. Condit,* 115 Or. 481, 482, 237 P. 360.

■■ As to the three minor children, we are of the opinion that the father should be granted the custody of the son Eugene, age seventeen, and the custody of

the daughters Colleen and Jacquolyn, aged eight and six respectively, should be awarded to the mother. The objection to giving the girls into the custody of the mother is, of course, the latter's association with Anderson. The alternative presented by the record is that they shall be in the custody of their father to be reared by his two elderly female relatives now living in Gresham, Oregon. There is nothing in the evidence to show that Mrs. Claude has not been a good mother except as she has permitted her association with Anderson to interfere with her parental duties. Without intending any reflection whatever upon the ladies to whom the defendant proposes to turn over the future care of these little girls, we may say that, if a choice of evils is presented in the solution of this difficult question, we are persuaded that the lesser evil is that which we have chosen. The harm to innocent children in a case like this comes from the broken home, and any disposition of their lives that a court in the performance of a judicial function attempts to make, is likely to be but a poor substitute for what they have lost through the divorce of their parents. But the welfare of little girls in such a case ordinarily lies in leaving them with their mother, and they should not be taken from her for any except the most cogent reasons.

Each of the parties should have the right of visitation of the children in the custody of the other at all reasonable times. The defendant should pay to the plaintiff for the future care and custody of Colleen and Jacquolyn the monthly sum of $75.00 for each of them, or $150.00 per month in all.

As stated above, the plaintiff seeks in this suit specific performance of the agreement of March 13, 1944, while the defendant demands its cancellation for

fraud. He alleges in his answer and cross-complaint that he was induced to enter into the agreement by the plaintiff's representations that she would abandon her association with Anderson, return to their home and fulfill her duties as a wife and mother, and that the plaintiff had no intention of keeping such promises at the time she made them, but the same were false and fraudulent.

We have already referred to some of the provisions of the agreement, and it is now necessary to call attention to others. The agreement recites the pendency of the first suit for divorce, and that one of the issues therein is the determination of the respective rights and interest of each of the parties in the property owned by them; that the plaintiff "claims to be the owner of an undivided one-third interest in all of the property held by these parties by virtue of an agreement alleged to have been made heretofore and during the year 1934"; and "regardless of any prior agreement it is the mutual wish and desire of the parties hereto that a full and final adjustment of all their property rights, interests, and claims, be had, settled and determined by said parties in and by this Agreement." It is then agreed "in consideration of the mutual promises, agreements and covenants contained herein", (1) that each shall receive the sum of $17,000.00 in the manner above stated, and that the plaintiff is the owner of an undivided one-third interest in all the properties; (2) *"that should these parties resume their marital life and continue to live together as husband and wife for the period of seven years from and after the date hereof"*, the common properties, with certain stated exceptions, shall be divided equally between them (italics added); (3) once each year there shall be a division of surplus earnings in

proportion to their respective interests in said properties; (4) that a trust fund shall be created for the education, nurture and care of the minor children; (5) that the parties shall use their best efforts and skill in the management of such business and industry as they may engage in; (6) that the parties shall keep up all life insurance policies now maintained on the life of the husband; (7) *"that should these parties resume their marital life"* the plaintiff shall properly care for the children and the home (italics added); (8) that the agreement shall be a full and complete settlement and adjustment of all the right, title and interest that each party shall have in the property of the other; (9) that the pending divorce suit shall be dismissed forthwith.

The previous agreement referred to as having been made in the year 1934 appears actually to have been entered into under date of June 3, 1935. It is sufficient for present purposes to say that it purports to create a partnership between the plaintiff and the defendant to which each party agreed to contribute all of his property, and the property of the defendant was deemed to constitute two-thirds and that of the plaintiff one-third of the partnership assets. A division of profits and losses according to their respective interests was agreed upon.

■ Counsel for the plaintiff contend that evidence in support of the defendant's charges of fraud cannot be received without violating the parol evidence rule, because to give effect to such evidence would be to incorporate in the writing a contractual consideration not therein expressed. They argue that the provisions of the contract which we have italicized leave uncertain and open for future decision of the parties the matter

of resumption of marital relations, whereas the evidence relied on by the defendant would show a binding agreement in that regard. They cite as authority for their position *Lange v. Allen,* 120 Or. 96, 251 P. 715, which holds that in a suit between the grantor and the grantee in a general warranty deed evidence of an oral agreement of the grantee reserving a life estate in the grantor is inadmissible in view of the provisions of §§ 2-214 and 2-406 (3), O. C. L. A. The former section provides that "when the terms of an agreement have been reduced to writing by the parties, it is to be considered as containing all those terms", etc., and the latter section, which is a part of the statute on conclusive presumptions, provides that there is a conclusive presumption of "the truth of the facts recited from the recital in a written instrument, between the parties thereto * * * but this rule does not apply to the recital of a consideration". The court, in the Lange case, held that the exception stated in this section does not apply to a contractual consideration, and hence that evidence of the oral agreement was inadmissible. We agree with the contention of counsel for the plaintiff that the contract of March 13, 1944, contains no provision binding the plaintiff to resume marital relations with her husband. But we are of the opinion that the Lange case does not govern the question here because in that case there was no charge of fraud, and the court was dealing simply with an attempt to prove and enforce the terms of an oral agreement not contained in the writing.

■ Where, however, the suit or action is based upon fraud and there is a claim by the party seeking the cancellation of a written agreement or other relief, that he was induced to enter into such agreement by

a fraudulent promise of the other party, the rule is that evidence of such fraudulent representations cannot be excluded by invoking the aid of the statute of frauds. It was so held in *Foss v. Newbury,* 20 Or. 257, 25 P. 669, a decision which is in harmony with the doctrine generally prevailing in the courts of this country. See 24 Am. Jur., Fraud and Deceit, § 267.

We think, therefore, that the evidence of plaintiff's representations to the defendant was properly admitted. But we are not satisfied that, viewed in the light of all the relevant circumstances, the proof of fraud is of that clear and convincing character that the law requires. It was not sufficient for the defendant to show that the plaintiff made the promises alleged and failed to keep them, and, unless a present fraudulent intent on her part to repudiate those promises clearly appears, the charge of fraud fails. The view that the plaintiff made the promises honestly and in good faith and later yielded to the temptation to renew her association with Anderson is quite as consistent with the evidence as the view that she was actuated by fraudulent intent. In that situation we think that the defendant has not sustained the burden of proof. Moreover, the provisions of the contract which leave open and undetermined the matter of resumption of their marital relations makes it difficult to believe that the defendant, in entering into the agreement, relied upon the alleged fraudulent representations. Proof of such reliance is an essential element of a cause of suit for fraud.

We have examined the cases cited by counsel for the defendant dealing with contracts between husband and wife or gifts made by one spouse to the other which have been canceled or set aside for fraud.

We think nothing is to be gained by reviewing these decisions, since they do no more than illustrate the application of settled legal principles to varying states of fact. The decision of every such case must depend on the facts of the particular case and the strength or weakness of the evidence adduced in support of the charge of fraud.

■ It results that the decree of the Circuit Court denying the defendant's prayer for a decree of divorce is reversed. The decree is affirmed in so far as it denied a divorce to the plaintiff, but reversed for failure to give the plaintiff appropriate relief under the contract of March 13, 1944. As the evidence upon that branch of the case is incomplete the cause must be remanded for further proceedings. After a hearing and determination of the remaining issues arising out of the property settlement agreement, the court is directed to enter a decree of divorce at the prayer of the defendant, such decree to contain provisions for the future care and custody of the minor children of the parties in accordance with this opinion, and such other orders as may be found to be appropriate upon such further hearing and determination. The property settlement agreement provides that the plaintiff "is the owner of an undivided one-third (1/3) interest in and to all of the property, real, personal and mixed, and wheresoever situated, now held, owned or possessed by the parties, or either of them." Pursuant to the provisions of § 9-912, O. C. L. A., the decree should grant to the defendant an undivided one-third part of his individual right in fee of the whole of the real estate, which the court shall find is owned by the plaintiff at the time of the decree by virtue of the terms of said agreement.