Argued March 4; affirmed March 18, 1947

# HUGHES *v.* HUGHES

(178 P. (2d) 170)

*Borden Wood,* of Portland (King & Wood, and Edward E. Grant, of Portland, on the brief), for appellant.

*Earl S. Nelson,* of Portland (Griffith, Peck, Phillips & Nelson, and Norman L. Easley, of Portland, and Cheney, Hutcheson & Gavin, of Yakima, on the brief), for respondent.

Before Rossman, Chief Justice, and Lusk, Belt, Bailey and Winslow, Justices.

WINSLOW, J. (pro tempore)

The parties to this litigation were married in Eugene on June 16, 1932. This is a controversy over the custody of a child, James B. Hughes, who was born in October of 1935. Domestic difficulties caused a separation of the parties, and, on January 18, 1938, the circuit court for Multnomah County granted a divorce to appellant and awarded to her the custody of the child. This decree likewise provided for the support of the child and for alimony to appellant. At the time this decree was rendered, the child was in Cascade, British Columbia. The parties were both residents of Multnomah County.

As time passed both parties remarried. Appellant established her residence in San Diego, California, and respondent established his residence in Yakima, Washington. The evidence shows that both have families by the second marriages, and that both are

comfortably and satisfactorily situated. There is one commendable feature about the case. Instead of each claiming that the other is not a fit and suitable person to have the custody of the child, both concede that the other is satisfactory to have such custody. The child is now with appellant in San Diego, California, and was not produced at the trial of this cause.

On the first day of August, 1944, respondent filed a motion for modification of the decree so that the child would be permitted to visit respondent at his home in Yakima, Washington, for a period of two or three months each summer. This motion was resisted by appellant, and it, together with some other matters to which it is not necessary to refer, came on for hearing on the second day of August, 1945, before the department of domestic relations. The court rendered its decision on the 26th day of December, 1945. The decree of the court was not entered until March 19, 1946.

By this decree the former decree was modified, granting to respondent the privilege of an extended visit from the child and awarding him custody for a period extending from June 15th to August 15th of each year, including 1946, less a period of five days to be used for travel. The decree further provided that the expense of transportation should be borne by respondent. There had been a controversy over delinquent payments upon the part of respondent which the court found to be in the amount of $373.65. The decree was further modified by increasing to $50 per month the allowance for the support of the child to be paid by respondent during the time the child was in the custody of appellant. In this appeal the only question involved is the modification with reference to custody.

██ Courts are always jealous of their jurisdiction. The child was in Canada at the time the decree of divorce was entered in this case. Ordinarily, where the child is out of the territorial jurisdiction, the court has no authority to enter any decree with reference to the custody thereof. 27 C. J. S. 1163. But in this case the parties were both residents of Multnomah County, and the absence of the child from the county seems to have been only temporary and for the convenience of the parties. Under those circumstances, the court had jurisdiction to make an award with reference to custody. *Griffin v. Griffin*, 95 Or. 78, 91, 187 P. 598; *Minick v. Minick*, 111 Fla. 469, 149 So. 483; *Schroeder v. Schroeder*, 144 Ga. 119, 86 S. E. 224; *Stephens v. Stephens*, 53 Idaho 427, 24 P. (2d) 52; *Stetson v. Stetson*, 80 Me. 483, 15 A. 60; *White v. White*, 77 N. H. 26, 86 A. 353; *State v. Rhoades*, 29 Wash. 61, 69 P. 389.

█ While there is some division of authority upon the subject, the majority rule, as well as the better considered cases, holds that the court once having acquired jurisdiction does not lose that jurisdiction to modify a decree by virtue of the fact that the child is removed from the state. 19 C. J. 350, cases in note 38; 27 C. J. S. 1187; also see note 70 A. L. R. 526.

█ We shall now give consideration to the decree as modified by the trial court. Appellant first contends that respondent was not entitled to such modification or any other relief because he did not come into court with clean hands. The contention is made that he was delinquent in payments under and by virtue of the decree as originally rendered. Much authority is cited to the effect that respondent had no standing to apply to a court of equity for a modification of the decree in view of this delinquency. However, we think

the matter can be disposed of by the mere statement that the record shows that there was some uncertainty as to the exact amount due under the terms of this decree, and that respondent had expressed himself willing to pay any amount the court found was due. The court found that there was $373.65 due. It was admitted on oral argument that this had been paid. Under the circumstances this contention is without merit.

It is next contended by appellant that the court cannot modify its decree unless there is a showing that there had been a change in the conditions existing at time the original decree was rendered, and the contention is made that there was no showing of any such change as would justify the court in making the modification entered.

■ At the time the decree was entered, both parties were living in Portland, living on very meager earnings. The child was two years and three months old, being cared for by his grandparents in Canada. Respondent was a travelling salesman representing the Planters Peanut Corporation throughout the Pacific Northwest and was on the road a large part of the time. We shall assume that the court rendered the original decree, assuming that the right to visit therein provided for would be available to respondent, since the parties were both residents of Portland at the time.

■ Appellant has moved over a thousand miles from Portland and has taken the child with her. Respondent has established his home in Yakima, Washington, and is not now travelling. The boy is now eleven years of age. It is wholly impractical under the present circumstances for respondent to avail himself of the

privilege and right granted to him by the original decree to visit the child at reasonable hours and places. The conditions have changed since the entry of the original decree. These changes were sufficient to justify the court in modifying the decree if thereby the welfare of the child would be enhanced.

■ This brings us to a consideration of the evidence and the affidavits of the parties as to whether or not the court was justified in making this modification of the decree. As was said by Justice LUSK in *Claude v. Claude,* 1946 ante p. 62, 174 P. (2d) 179, 186:

"The harm to innocent children in a case like this comes from the broken home, and any disposition of their lives that a court in the performance of a judicial function attempts to make, is likely to be but a poor substitute for what they have lost through the divorce of their parents."

We add to this an excerpt from *Sachs v. Sachs,* 145 Or. 23, 29, 25 P. (2d) 159, 26 P. (2d) 780:

" 'The controlling consideration, paramount above all others, is the welfare of the child. It is not a chattel like pigs, chickens or furniture, to be divided between the divorce litigants on the bases of monetary value; neither is its custody to be made the vehicle for the continuation of their antagonisms and resentments toward each other.' Merges v. Merges, 94 Or. 246 (186 P. 36); McKissick v. McKissick, 93 Or. 644 (174 P. 721, 184 P. 272)."

As we have pointed out above, the removal of appellant from Oregon has made the provision of the original decree with reference to the right of visitation upon the part of respondent wholly impractical. Respondent seeks to remedy this situation by this modification so that he may have the child in his own home for a period of two months during summer vacations.

Appellant does not question respondent's moral character, nor the sufficiency of his home to adequately care for the child during these summer vacations.

At one time there was some discussion between the parties about the child being adopted by appellant and her present husband. This might have solved the problem. The reason for this arrangement not being carried out is narrated by appellant as follows:

"Q And your present husband, you say, is very good to the boy?

"A Yes.

"Q They get along fine together?

"A Yes.

"Q He has refused to adopt him, has he not?

"A Not actually refused. He thought it would be better for the child, because we feel Mr. Hughes is doing better and it would cut his inheritance under these circumstances, so we feel we should not adopt him."

It is a strange motive indeed that prompts appellant and her present husband to want this boy to inherit from a man he does not even know.

Appellant was pressed on cross-examination for a legitimate reason why the court should not make the modification which respondent requested. With reference to that matter, appellant gave the following testimony:

"Q And so far as you know, Mr. Hughes maintains a proper home life in Yakima, does he not?

"A I don't know anything about it.

"Q Well, you are not prepared to say or have no evidence it is not a proper home?

"A I didn't try to get evidence.

"Q And you would object to Mr. Hughes having his boy with him in the summertime, I understand, because the boy has friends down in San Diego and somebody owns a 240-acre ranch with a swimming hole on it, and everything else he can go to?

"A Well, he is utterly delighted he could go while I was up here.

"Q That is natural, something a young boy would like?

"A I think so.

"Q And you have no reason to believe that Mr. Hughes could not afford him entertainment in Yakima in the summertime?

"A I don't know. I think after ten years he would become emotionally upset to go up there.

"Q Therefore, you take the position that he should be denied the companionship of his father in the summertime because he would be emotionally upset?

"A Well, I think I know him myself.

"Q Is that what you want to tell us?

"A Yes.

"Q Is there any other reason you object to Mr. Hughes having the opportunity to be with his son or having him in his own home?

"A I don't think he has been a father or has ever tried to be a father to him.

"Q And because of the past, you think Mr. Hughes, then, should not be permitted the opportunity to see or have the companionship with his son; is that right? * * *

"A That is past, present and future.

"Q That is, regardless of whether he has or has not paid the arrears in money that was expected here, that makes no difference to you? You are just opposed to him seeing his son?

"A No. He didn't even want the child in the first place. He didn't want it before he was born, and he has never supported him since.

"Q  Well, if he did support him, Mrs. McInnis, then would that remove your objection to his having the opportunity to have him with him?

"A  I think it is very late, don't you?

"Q  Then, you would object to it regardless?

"A  Yes."

The record discloses that respondent likewise has a nice home and that he has a friend who has a ranch, ponies and a swimming hole.

What arrangement is for the best interest of this child? The question is not an easy one. Never was a more important question propounded to a court. We do not possess the wisdom of Solomon nor the vision of Isaiah. We must answer as best we can, limited by many human frailties. What is best for the boy is likewise best for society and best for his parents. Sometimes it is hard for the parents to see this. We are sure, however, that if these parents, or for that matter this court, could see through the veil of uncertainty which shrouds the impenetrable future; if we could but see twenty-five years into the realm of the hereafter, and see this boy having come into man's estate; physically strong, healthy and alert; possessed of integrity, industry and acumen, and overflowing with humanity, loyalty and understanding, we would all join in pronouncing the course that led to this success the right answer to this problem. One thing we do know. If these parents continue to match swimming hole with swimming hole, dude ranch with dude ranch, and make a playboy out of the child, neither this, nor any other arrangement, will succeed in developing in him that sturdy character that these fond parents hope for, or the kind of a citizen society needs. Probably the future of this country does not depend on

this boy or this decision. Yet who knows how much the morrow needs him, or what part he may play in the shaping of the destiny of our country. Every boy, or girl for that matter, needs, and needs desperately, both a father and mother, all of the time, not just part time. If these parents had shown as much concern for this child's welfare in the past as they now exhibit; if they had been more tolerant, forgiving, forbearing; if they had not treated so lightly their solemn marriage vows, they could have escaped the embarrassing position they now find themselves in, where they must depend on the fallable judgment of this court to work out the destiny of their child.

The decree will give the child a chance not only to know that he has a father, from whom he may inherit, but to become acquainted and associated with him. It will provide an opportunity for development and nurture of that filial tie and affection between father and son so desperately needed by every child, and second in importance only to the same relationship between mother and child.

The decree as modified, as we see it, is the only practical way of even approaching the maintenance of both these relationships, a poor substitute indeed for what these parents could have given this child. If these parties lived in the same community where the father might have and enjoy the right of visitation given him by the original decree, and this boy might know and learn to respect and have the benefit of the influence of his father, a different question would be presented. *Gallagher v. Gallagher,* 178 Or. 223, 166 P. (2d) 135, 137; *Parker v. Parker,* 1946, ante p. 182, 175 P. (2d) 167. But the parties, not thinking of the welfare of the child, have made this impossible. As

was said by the supreme court of Montana in *Kane v. Kane,* 53 Mont. 519, 165 P. 457, 459:

> "Unless it can be said with reasonable certainty that the father is morally unfit to associate with the child, the dictates of humanity call for such regulations as will permit him to see his own offspring. 'It must be borne in mind that the tie between parent and child is one of the most binding in human life, one which the law of nature itself has established.' No legislation, no judicial interpretation of legislation, should lightly disregard the reciprocal duties of this relationship."

Why is that right of visitation so important? It is not solely to gratify parental yearning. Basically, it is for the welfare of the child.

One thing more is certain. It will require the utmost of good faith on the part of both parties to make a success of this arrangement. But the court has not lost jurisdiction; and, if either or both of the parties display a lack of cooperation necessary for the success of this solution of the problem, the court is not without power to correct even that situation.

The lower court made the only practical disposition of a most difficult problem. The decree as modified is affirmed without costs to either party.