Argued March 7, affirmed April 18, 1951

# HOLLINGSWORTH *v.* HOLLINGSWORTH
229 P. 2d 956

*Orval N. Thompson* argued the cause for appellant. On the brief were Weatherford & Thompson, of Albany.

*W. P. Riddlesbarger* argued the cause for respondent. On the brief were Harris, Bryson, Riddlesbarger & Butler, of Eugene, and Oehler & Huston, of Corvallis.

Before BRAND, Chief Justice, and HAY, LUSK, LATOURETTE and TOOZE, Justices.

HAY, J.

The plaintiff, Ada Elizabeth Hollingsworth, has prosecuted this appeal from a decree of the circuit court for Benton County. The suit was instituted by Mrs. Hollingsworth against her husband, Joseph B. Hollingsworth, for a dissolution of their marriage. The complaint charged the husband with cruel and inhuman treatment of the wife (1), by preferring the welfare of his two adopted sons over her's; (2), by failing to perform the conditions of an agreement into which the parties entered upon dismissal of a former suit for divorce which was instituted by the husband; (3), by refusing to discuss his business affairs with his wife, and by refusing to permit her to be present on occasions when he discussed such affairs with his sons; (4), by telling her, subsequent to dismissal of the former suit, that he did not care for her, that their

marriage was a mistake, and that she should go her way and he would go his; (5), by being sullen and arrogant, and refusing to show any affection for her; and (6), by abandoning her, without cause or provocation, while she was ill. She prayed for a decree of divorce, for $70,000 alimony in gross, $200 per month alimony by instalments, $5,000 attorney's fees, $200 suit money, and an undivided one-third of the husband's real property. The husband answered by general denial, and affirmatively, by way of cross-complaint, prayed a decree of divorce in his favor, and, as grounds thereof, charged his wife with cruel and inhuman treatment towards him, as follows: (1), an attitude of public hostility towards his adopted sons, and especially towards his adopted son Robert, a disabled war veteran; (2), refusal to live with him as his wife in his home at Eugene, Oregon; (3), disparagement of husband to third persons; (4), constant consultation with and action upon the advice of her mother, and refusal to divulge any of the wife's business affairs to the husband while insisting upon being informed relative to his, and (5), interference by the wife's mother in the affairs of husband and wife, with the wife's approval. In her reply, besides denying generally the husband's cross-complaint and giving her version of matters therein alleged, the wife attempted to plead condonation of the matters alleged against her as having occurred prior to the dismissal of the former suit. After a hearing, the trial court entered a decree of divorce based upon the husband's cross-complaint.

The appellant's principal assignments of error may be summarized by saying that they are based upon the refusal of the trial court to decide the controversy in her favor and its decision in favor of the husband.

The wife was born and reared in Benton County. She was of the age of approximately 40 years at the time of her marriage to the defendant on September 25, 1943. He is about 14 years her senior. She had been for some 15 years in the employ of the First National Bank of Corvallis and its successor, the United States National Bank of Portland, Oregon, before her marriage. The defendant was a funeral director, and had been engaged in that business for about 36 years, 17 years in Newberg, 18 years in Corvallis, and about a year in Eugene. He had been married previously, and his first wife had died in 1936. He had two adopted sons, the elder of whom was of full age, married, and living in a home of his own, while the younger was a soldier in the army of the United States at the time of the marriage of their father to plaintiff.

Plaintiff had lived with her parents at Corvallis nearly all her life. Her father died in 1942. Thereafter she and her mother lived together at the family home in Corvallis. It was contemplated by the parties that after their marriage they would live in Eugene. The husband owned a mortuary chapel there, with a seven-room residence and two apartments adjoining it. They intended to occupy the residence as their home. It was arranged that the wife's mother would live with them. The residence was unfurnished, and the mother-in-law was to move her furniture from Corvallis and furnish the Eugene home therewith. When the time came to move, however, the mother-in-law was reluctant to leave Corvallis. Her indecision was quite understandable. She had lived in Corvallis for many years. Her late husband's family had been highly respected pioneers of Benton County. Her social position in Corvallis was assured, and the contemplated removal to

Eugene was a venture upon which she hesitated to embark. The upshot was that she finally decided not to move, and her daughter apparently could not bring herself to the point of moving without her.

Meantime, the husband was obliged to live in Eugene and operate his business, making occasional trips to Corvallis. He was continually urging his wife to come to Eugene and live there in his home, and she, for a variety of reasons, excused herself from coming. She did make visits to Eugene at intervals of a week or longer, usually accompanied by her mother. Sometimes she returned the same day to Corvallis; sometimes the next day. She never moved any of her personal belongings to Eugene. The longest time she ever lived with her husband at Eugene was four days.

At the time of the marriage, as has been mentioned, the husband's younger son was a soldier in the army of the United States. He was extremely proud of this son, and inclined to talk about him considerably. He also wrote him short letters almost every morning. The wife resented these things. As a new bride, she felt that her husband's attentions should be centered upon her. This situation caused some discord between them. The son had a distinguished war record, having served as a combat soldier in two campaigns in Africa, in the Sicilian campaign, and in the Normandy invasion. In the latter, he was very severely wounded. He was returned to the United States, and was thereafter hospitalized for long periods of time, during which he underwent no fewer than 15 surgical operations and received blood transfusions amounting to 75 pints of whole blood. He was brought eventually to his father's home at Eugene. His condition was so critical that his father evidently feared that he might do himself an

injury. The wife testified that one of her reasons for refusing to live with her husband in Eugene was that she was afraid to be left alone with the son, in case he might do some rash act for which her husband would blame her. She was actively resentful of the fact that her husband was extremely solicitous of his son's welfare and did everything in his power, both financially (which he could well afford), and otherwise, to help him. This attitude on the part of the wife served to aggravate the husband's disapproval of her refusal to establish a home with him at Eugene.

The impasse between the parties continued. The husband tried by all manner of persuasion to induce the wife to join him at Eugene, and she continued to find reasons satisfactory to herself for refusing, and so refused. There was no unmannerly bickering between them; each treated the other with courtesy and respect. After three and a half years, the husband sought to bring the controversy to an end by instituting suit in the Lane County circuit court for a divorce. The suit having come on for hearing on May 22, 1947, the parties, at the instigation of the wife, agreed to a dismissal, and entered into a written agreement which, omitting the formal parts, reads as follows:

"It is stipulated and agreed between the parties hereto as follows:

"1. Immediately after the dismissal of the complaint and cross complaint in the divorce suit now pending between the parties, the parties will establish a home exclusively for themselves at a place mutually agreeable;

"2. That no member of the family of either of the parties shall make their home at the place thus established.

"3. That they will enter into such business as

they mutually agree upon and each will put forth such effort as within his or her power may be necessary to make the business a success.

"4. That the life insurance held by Joseph B. Hollingsworth shall be maintained and one-third thereof shall be made payable to Ada Elizabeth Hollingsworth and one-third to each of his adopted sons;

"5. That Ada Elizabeth Hollingsworth will make Joseph B. Hollingsworth beneficiary of her insurance policy."

██ It is contended that the execution of such agreement, followed by dismissal of the suit and resumption of cohabitation by the parties, operated as a complete remission and condonation of all of the causes of suit upon which the husband had relied in his complaint. *Jones v. Jones,* 59 Or 308, 311, 117 P 414, 111 ALR 935. Section 9-911, O.C.L.A., provides that when a suit for dissolution of the marriage contract is based (among other things) upon cruel and inhuman treatment or personal indignities rendering life burdensome (as is this suit) the defendant may admit the charge, and show in bar that the acts charged have been expressly forgiven. In the original suit, both complaint and cross-complaint were based upon alleged cruel and inhuman treatment. The husband's charges were the same, in part, as those upon which he now relies. The written agreement was neither expressly nor by implication an admission by either party of the charges which had been made against him by the other. The effect of the agreement and subsequent cohabitation was not condonation of any matrimonial offense, but simply a mutual reconciliation. 1 Nelson on Divorce and Annulment, 2d ed, § 11.14. The plaintiff has attempted to plead the agreement by way of condonation,

but, as she did not in any respect admit the former charges, the plea of condonation is ineffectual.

■ In any event, in Oregon, condonation of a marital offense other than adultery cannot be implied by mere resumption of voluntary cohabitation after knowledge of such offense by the innocent party. To constitute legal condonation in such cases, there must be an express forgiveness. *Saville v. Saville,* 103 Or. 117, 122, 203 P 584; *Claude v. Claude,* 180 Or. 62, 68, 174 P. 2d 179. There was none here, and, as the case stands, the only condonation that existed was such as might have been implied by the resumption of cohabitation, which, as we have shown, is not legal condonation under our law except in adultery cases. Under the circumstances, it was competent for the husband in the instant suit to renew the allegations of cruel and inhuman treatment which he asserted in the former suit, coupled with allegations of a continuation of similar conduct by the wife subsequent to the reconciliation.

■ We have been at pains to read carefully and to digest to the best of our ability the 439 typewritten pages of testimony which was adduced at the hearing. The testimony was sharply conflicting, particularly that of the principals. Nevertheless, after mature consideration, we are satisfied that the equities of the case are with the husband, and that he established by a clear preponderance of the evidence that he was entitled to a decree in his favor. No public purpose would be served by a detailed recital of the evidence as to the acts of the parties subsequent to the reconciliation. It is sufficient to say that they took up their residence at the home of the wife's mother in Corvallis, and remained there, except for a number of excursions for mixed reasons of business and pleasure, until the final

separation in February, 1949. During that period of less than two years, in our view of the evidence, the husband endeavored to the best of his ability to find a place of residence which would be satisfactory to the wife, but was unable to do so. On many occasions, he endeavored to persuade her to come with him to Eugene where his home was and where his business interests were centered. There was in fact nothing in the agreement of reconciliation which barred Eugene as a place of residence. The terms of the agreement, under which the parties agreed to establish a home at a place mutually agreeable, and to enter into such business as they should mutually agree upon, were obviously not terms which were capable of strict enforcement. It is apparent that they were unable mutually to agree upon those matters.

■■ At common law, the husband is the head of the family, unless incapacitated from executing the authority and performing the duty. 26 Am Jur, Husband and Wife, § 10. He has the legal right to select the domicil, and the wife, in the absence of a justifiable excuse, is under a legal obligation to follow him there. *Stewart v. Stewart,* 117 Or. 157, 162, 242 P. 852, and cases cited. No such justifiable excuse was offered by the wife in this case. Her contention that the husband's home lacked suitable furniture is completely rejected by the fact that the husband practically gave her carte blanche to select whatever furniture she desired. Her excuse that she was unable to find "suitable" furniture because of war conditions is somewhat feeble. If she had wished to make a home, she might easily have got along with furniture that was less than suitable. Her somewhat unreasoning jealousy of the husband's adopted sons was carried over into the period

subsequent to the reconciliation, notwithstanding the fact that the sons kept their distance and did not interfere with the parties in any objectionable respect.

While we believe that we have rightly determined the preponderance of the evidence, nevertheless we deem it appropriate to say that our decision has been fortified by that of the trial judge, who saw and heard the witnesses testify. *Rysdam v. Rysdam,* 160 Or. 153, 154, 84 P. 2d 112; *Andrews v. Andrews,* 162 Or. 614, 615, 94 P. 2d 300; *Fuller v. Fuller,* 175 Or. 136, 139, 151 P. 2d 979.

The decree is affirmed. Costs will be allowed to neither party.