Argued February 11, affirmed March 5, 1970

LISOSKI, *Respondent, v.* THE EMBERS,
*Appellant.*
465 P2d 888

*William L. Hallmark,* Portland, argued the cause for appellant. With him on the briefs were McMenamin, Blyth, Jones, Joseph & Lang, Portland.

*John J. Haugh,* Portland, argued the cause for respondent. With him on the brief were Pozzi, Wilson & Atchison, Portland.

Before SCHWAB, Chief Judge, and LANGTRY and FOLEY, Judges.

LANGTRY, J.

This is an appeal from the circuit court's judgment on a *de novo* review of a workman's compensation case. The circuit court allowed an increase from 10 per cent to 30 per cent loss of an arm by separation for unscheduled disability to the lower back. The claimant suffered the injury when she lifted a tray of dishes in connection with her duties as a waitress. The Closing and Evaluation Section of the Workmen's Compensation Board made the original finding of 10 per cent loss on January 22, 1968, and it was upheld by the Hearing Officer and the Workmen's Compensation Board. The circuit judge concluded that the Hearing Officer and the Board drew erroneous conclusions from the evidence.

For example, testimony was produced by leading questions of the claimant by the Hearing Officer:

"Q I would assume the dancing you can't do any longer are the jerk and the bugaloo and the swim and that sort of thing?

"A Yes."

She then testified that she still could do the waltz and fox trot, but said:

"A * * * Sometimes, if I dance too much, I feel it for the next couple of days."

The Hearing Officer again questioned:

"Q I think the jerk would give anybody a back pain?

"A. I don't do that."

These questions and answers are the most that can be found in the record to show claimant's continued troubles came, in any part, from doing the Boogaloo and Jerk. They simply indicate she has not performed such dances, at least since the injury, and her denials in this respect were borne out by the uncontradicted testimony of Maxine Paden, a close friend, that since her injury she has almost completely stopped dancing, and never does the modern dances, although she frequently danced before.

Another example is claimant's testimony and physicians' written reports about corrective exercises the claimant was to do. In her examination the claimant said:

"A * * * [A]nd then I do exercises.

"Q What sort of exercises?

"A He gave me—the physical therapist gave me five different exercises to do that strengthen my stomach muscles and abdomen to take the pressure off the back, I guess."

The letters from claimant's orthopedist, Dr. Howard L. Cherry, and the examining orthopedist for the defendant, Dr. Norman Logan, indicate that she would benefit from back-building exercises, since the abdominal muscles were weak. The Hearing Officer concluded:

> "* * * [H]er testimony indicated that other attacks have been precipitated by dancing modern dances such as the Boogaloo and the Jerk * * * Although claimant testified she does her exercises regularly, I suspect this testimony is not true. I suspect that claimant's back and stomach muscles are quite weak and most of the time she guards against any movement or activity which would precipitate pain. Then on occasion, she will engage in some strenuous activity such as the modern dances * * * whereupon her weak and unused muscles will become painful and sore, not so much because of the residual effects of her injury, but because they have completely lost their strength and tone due to lack of use."

We agree with the trial judge that the record does not substantiate the "suspicions" of the Hearing Officer.

These "suspicions" were perpetuated in the findings of the Workmen's Compensation Board, wherein it said:

> "The claimant has had subsequent exacerbations of her symptoms precipitated by dancing the Boogaloo * * *. The problem is simply that the claimant fails to obtain or maintain proper muscle conditioning and that under such circumstances the muscles are more susceptible to renewed strain * * * *."

■ "Suspicion" as a guide for determining questions of disability, like other fact questions, is of doubtful validity. See Workman Compensation Practice in

Oregon 77, Compensability Requirements § 7.22 (Published by the Oregon State Bar Committee on Continuing Legal Education—1968). Under the new Act the amount of disability is a fact question on the evidence for the Hearing Officer who sees and hears witnesses and receives written reports. It is also a fact question for the Board, the circuit court, and the Court of Appeals, all *de novo* on the record.

In reviewing the record *de novo* under the law, the Court in *Ryf v. Hoffman Construction Co.*, 254 Or 624, 632, 459 P2d 991 (1969), said:

> "* * * [I]t is proper for us to consider the expertise of a government agency *as a whole*, whether an administrative body or a trial court. This was the import of our holding in *Romero v. State Compensation Dept.*, 250 Or 368, 440 P2d 866 (1968) * * *. (Emphasis theirs.)

> "* * * * *

> "* * * [W]e may decide that the administrative officer erred in rejecting or accepting certain evidence or erred in some other procedural way. And *we are free to exercise our judgment in the appraisal of the evidence to the extent that we can do so from an examination of the record.* But this is not in derogation of the basic idea expressed in *Romero*." (Emphasis supplied.)

■ The record shows that on April 30, 1968, the attending orthopedist, Dr. Cherry, in a letter stated:

> "In view of the fact that this lady does have recurrent attacks of back strain with remissions, and based upon my several examinations of her, I would estimate her permanent partial disability as being equal to twenty (20) percent loss of function of an arm."[1]

---

[1] Prior to amendment of the act in 1965, permanent partial disability, unscheduled, was related to "loss of function" of an

Dr. Cherry had treated the claimant's injury from around the first of July 1966 until April 30, 1968. On January 9, 1968, he reported:

"\* \* \* Her examination at this time does not show very much but during her periods of exacerbation which have occurred recently she is quite sore and her examination would be very much different \* \* · \* I feel it is likely Mrs. Lisoski will require further treatment off and on in the future."

Evidence showed that claimant had suffered from back strain two or three times (once during a pregnancy) prior to the back injury she received on the job in May 1966, and that on each occasion she had quickly and completely recovered. Neither Dr. Cherry nor Dr. Logan in their reports attributed any of her present back troubles to the former episodes, although it was indicated they were made aware of them by claimant. Claimant suffered pain and numbness in the right leg after this injury, for the first time. Despite these facts, the Board found:

"\* \* \* It is equally logical to place the en-

extremity. The old act is what Dr. Cherry was apparently using as a guide.

"\* \* \* Prior to the 1965 amendments, unscheduled disabilities were rated by comparing them to the 'loss of function' of an extremity. The 1965 Act changed this formula by comparing them to a 'loss of any member named in the schedule' \* \* \*.

"Effective July 1, 1967, ORS 656.214(4), was re-amended \* \* \* eliminated the reference to loss of a scheduled member. Therefore, reference to loss by separation or loss of use of a scheduled member is no longer valid for accidents occurring subsequent to the amendments \* \* \*." Workman Compensation Practice in Oregon 151-52, Compensation § 11.41 (published by the Oregon State Bar Committee on Continuing Legal Education—1968).

Thus, the guide for the instant case, where the injury occurred in May 1966, is the loss by separation of an arm.

tire blame for new episodes upon the pregnancies or the severe episodes in 1959, 1964 and 1965 as upon the 1966 work incident. The fact that one episode occurred at work is not a sound basis for placing all responsibility thereafter upon the doorstep of the industrial injury."

■ We give weight to the Hearing Officer's findings in situations where he saw and heard the witnesses. *Moore v. U. S. Plywood Corp.*, 1 Or App 343, 462 P2d 453 (1969). *Romero*, supra, holds that we consider the expertise of the "agency as a whole, whether an administrative body or a trial court." *Ryf*, supra. But, as stated in *Ryf*, we make our own determination from the record. We conclude the findings of the Hearing Officer and the Board in this case run contrary to the evidence.

■ The evidence shows that the claimant's principal occupation came through referrals to temporary jobs as a switchboard operator and clerk from Russell Brown Office Service. She lost substantial amounts of time which she attributed to her injury complaints. We believe, from all of the evidence, that she will lose substantial time in the future from the same cause. We take into consideration that her type of employment often results in lapses of employment, and she testified that she sometimes takes time off to be with her children on their vacations during the school year. Considering these factors, and the opinion of her attending physician (Dr. Logan expressed no opinion except that she will suffer no permanent injury, and should continue treatments with Dr. Cherry), our determination coincides with the determination of the circuit judge that 30 per cent loss by separation of an arm for unscheduled disability is justified.

The judgment is in all respects affirmed.