Argued April 28, affirmed June 11, petition for rehearing allowed July 21, re-argued September 21, affirmed November 23, second petition for rehearing denied December 22, 1970, petition for review denied February 9, 1971

# HANNAN, *Respondent*, *v.* GOOD SAMARITAN HOSPITAL, *Appellant.*

471 P2d 831
476 P2d 931

*William L. Hallmark*, Portland, argued the cause for appellant. With him on the briefs were Daryll E. Klein and McMenamin, Blyth, Jones, Joseph & Lang, Portland.

*John J. Haugh*, Portland, argued the cause for respondent. With him on the brief were Pozzi, Wilson & Atchison, Portland.

Before SCHWAB, Chief Judge, and LANGTRY and FORT, Judges.

## SCHWAB, C. J.

We are again required to review a compensation claim in which the parties disputing the nature and extent of claimant's disability have wended their weary way to this court at considerable expense in time and money, not only to them, but also to the state. The number of briefs we have received from claimants and direct responsibility employers, arguing not only the issues of the individual cases, but the proper scope of judicial review, lead us to discuss the history and effect of the present Workmen's Compensation Law before embarking on a review of the case at hand.

Stated in simplified terms, workmen's compensation coverage provides a system of compensation for occupational injury and disease without regard to negligence. For many years prior to 1965 an employer had the choice of obtaining workmen's compensation coverage from the state or rejecting that coverage and subjecting himself to the unlimited liability of the Employer's Liability Act as the price of being free from the duty to compensate a workman for injuries not caused by the employer's negligence. If an employer elected to purchase the protection available from the state the injured workman received compensation even absent negligence on the part of anyone, but was in turn precluded from bringing an action against his employer for the employer's negligence. Under the pre-1965 system, an award was made by the State Industrial Accident Commission to the claimant-workman. If he was not satisfied he had a right to a jury trial at the circuit court level. At that trial he produced witnesses; the commission produced witnesses, the court instructed the jury on the applicable law, the jury returned its verdict which was reduced

to judgment, and the scope of review on appeal was no broader than that in any other action at law. The parties were entitled to only one trial on the facts. Although the jury's verdict was not directly in the form of dollars, it was in a form convertible into dollars by statutory formulae.

When certain peculiarities of verbiage are stripped away, a jury trial in a workmen's compensation case was not unlike a jury trial in any other personal injury case in so far as it determined the nature and extent of injuries and the amount of compensation.

There has been much criticism of the American system of jury trial of personal injury cases. One of the most oft-repeated criticisms has been that juries are too prone to display undue sympathy for injured claimants and thus give money to those who are not entitled to any, and to others more money than warranted by their injuries. This may or may not be so in so far as individual juries and individual cases are concerned. However, it is interesting to note that as a matter of common knowledge, at least in the metropolitan areas of Oregon, for many years past a large number of automobile liability insurers defending personal injury claims have demanded their right to trial by jury—even though many plaintiffs, on the advice of experienced counsel, have offered to waive jury and submit their claims to a trial judge sitting without a jury. The same has been true of the Oregon State Highway Division which commonly insists on its right to trial by jury when it seeks to acquire property by means of condemnation proceedings.

As is pointed out in *Coday v. Willamette Tug & Barge Co.*, 250 Or 39, 440 P2d 224 (1968), the legislative history of the 1965 compensation law vividly

tells the story of the struggle between the forces that wanted to preserve the pre-1965 system and those that wanted to go to a "three-way" system which gave private insurance carriers and direct responsibility employers the right to provide workmen's compensation coverage and still reserve to the employer protection from unlimited liability. Those who wanted to preserve the old system were greatly concerned with saving the right of the claimant to de novo trial by a jury. Those who wanted to get into the compensation business were apparently fearful of the results of a jury trial system on the costs to them. Out of this struggle came a trial and appeal procedure based, so far as we can perceive, not on the principle, either of administrative or judicial determination, but on a compromise of those conflicting principles—a compromise which in a sense demeans both the judicial and the administrative processes.

Regardless of the number of standards the human mind has so far devised, formulae for valuing injuries in terms of dollars are at best imprecise. For example, pain is subjective. Even though we say only disability is compensable, that pain and suffering are not, pain governs movement, and movement affects degree of disability. In many instances the type of claim which results in litigation under the Workmen's Compensation Law, like many claims arising out of automobile and other types of accidents, must be valued by application, not only of law, rules of evidence and logic, but also by application of experience, intuition, philosophy and probably other factors.

The conflicting economic and social pressures focused on workmen's compensation claims, coupled with the imprecision inherent in adjudicating the type

of workmen's compensation claim that is most frequently litigated, could very well lead to the conclusion that the jury had a unique value in disposing of such claims. By its makeup the jury is peculiarly immune from external pressures. Its 12 people are more likely than a full-time professional entity to reflect a cross-section of philosophies and experiences. Having reached its decision on a combination of factors, objective and subjective, a jury is not then called upon to justify its findings by articulating precise and rational reasons as the basis of its decision.

By the foregoing we do not mean to imply that the only suitable means of litigating compensation claims is trial by jury. We do believe that granting four de novo hearings as a matter of right is not a desirable alternative.[1]

In most controversies, large and small, a man is entitled to one trial on the facts. A man on trial for murder and facing life imprisonment gets one trial on the facts. A man who is a paraplegic as a result of an automobile accident gets but one trial on the facts, as does the defendant. Litigants whose entire personal fortunes may be at stake get one trial on the facts unless by virtue of accident of history the controversy is denominated as one in equity, in which case they may have two trials on the facts.

This law imposes upon appellate courts a function which modern jurisprudence is recognizing appellate courts are not best designed to do—that of being fact-finders. Yet the 1965 Workmen's Compensation Law gives the litigants, at the choice of any one of them,

---

[1] See the Baker County Circuit Court opinion, In the Matter of Eila A. Hopkins, reported in Vol 6, No 1, The Willamette Lawyer, p 5 (October 1969).

four trials on the facts as a matter of right, and perhaps a fifth at the discretion of the Supreme Court. Under this law the Closing and Evaluation Division of the Workmen's Compensation Board determines the award to the injured workman.

If he or the insurer is dissatisfied either is entitled to a "trial" on the facts at the administrative level before a hearing officer appointed by the Workmen's Compensation Board.

If either is dissatisfied with the results of that hearing he is entitled to a "trial" de novo on the record by the Workmen's Compensation Board.

If either is dissatisfied with the results of that trial he is entitled to a "trial" de novo on the record in the circuit court.

If either is dissatisfied with the results of that trial he is entitled to a "trial" de novo on the record in this court.

If either is dissatisfied with the results of that "trial" he may petition the Supreme Court for review. No such review has yet been heard and we will not speculate here on the scope of such a review.

Arguments can be made for not terminating "de novo" review, as we hereinafter indicate we understand this term, short of a hearing by an entity as independent of pressures as can be reasonably devised. It may be that the present administrative structure cannot provide this. If this is so, and if judicial trial "de novo" is the solution, then it would seem that one judicial trial "de novo" would be sufficient.

Nonetheless, we must decide the cases that presently come before us under existing procedural statutes as those have been interpreted by Supreme Court opinions. As indicated above, the present Workmen's

Compensation Law provides for de novo review on the record at Circuit Court and Court of Appeals levels. We believe some discussion of what comprises the exercise of this function may be helpful.

In the United States trial de novo on appeal is the historical outgrowth of a legal system which is in large part a descendant of the English system. 27 Am Jur2d 518, Equity § 3, says:

> "Some authorities say that the court of chancery in England was, in the exercise of its ordinary jurisdiction, a court of very great antiquity, it even being asserted that it was an original and fundamental court, as ancient as the Kingdom itself. The equitable or extraordinary jurisdiction of the court of chancery, like most of the other institutions of the English common law, seems to have grown up from the exigencies of the time and of judicial administration, and from time to time it was enlarged to meet those exigencies. Other authorities deduce the genesis of the equitable jurisdiction of the court of chancery from the practice of petitioning the King, as the fountain of justice, for relief in those particular cases where the positive law, lex scripta, was deficient * * *."

> "* * * [P]rovision for review is traditional in the Anglo-American legal system, as in the jurisprudence of most other countries, and the court system of each of the United States, as well as that of the federal government, makes provision for review procedure of one kind or another, either by constitution or statute." 4 Am Jur2d 533, Appeal and Error § 1.

> " 'Appeal,' as it was taken from the civil law and applied in the English courts of equity, amounted to a transfer of the proceedings as such from the court below and a trial de novo, on the law and facts, in the superior court. State v. Hardy, 339 Mo 897, 98 SW2d 593 [1936]." 4 Am Jur2d 533, Appeal and Error, n 7.

The importance of the division between law and equity has decreased, and we now generally speak of appellate review of lower court decisions both in law and in equity as appeals. Historically the word appeal connoted a de novo review of the ruling of a court of equity and the appellate review of judgment in an action at law was by "writ of error." In 5 Am Jur2d 263-64, Appeal and Error § 822, we find:

"In an equity case where the appeal involves a complete trial de novo, it has frequently been held that the appellate court is not committed by findings of fact made by the chancellor, but may and must determine anew questions of fact as well as questions of law. [In Re Estate of Cruson, 189 Or 537, 221 P2d 892, 20 ALR2d 219 (1950)]. The rule probably has its roots in the circumstance that under the original equity practice, the evidence was entirely documentary, testimony being taken in the form of depositions, so that the appellate court was in as good a position as the chancellor to weigh it, and the view is sometimes taken that even where the review is by trial de novo, at least where the appellate court is limited to the consideration of the record below and that record is based on oral testimony of witnesses before the chancellor, his findings of fact based on substantial evidence will not be reviewed on appeal. Indeed, under the modern practice in most jurisdictions, the tendency is to give the finding of fact of the trial court or chancellor the weight of a jury verdict, so that they are regarded as conclusive in so far as they find any substantial import in the evidence * * *."

Some jurisdictions, notably the federal system, have largely abolished the distinction between law and equity with the result that the scope of appellate review in all cases is closer to that formerly performed by the "writ of error." Fed R Civ P, with Amendments Effective July 1, 1968, provide there shall be one form

of civil action (Rule 2), and that findings of facts by a judge sitting without a jury shall not be set aside unless clearly erroneous (Rule 52).

In Oregon the statutory rule has always been that appellate review of decrees in equity is de novo on the record. The current version of that rule is contained in ORS 19.125(3) which provides:

> "Upon appeal from a decree in a suit in equity, the cause shall be tried anew upon the record."

■ Our review of the opinions of the Oregon Supreme Court applying that statute leads us to the conclusion that in Oregon a de novo review is a trial anew in the fullest sense, with the findings of the trial court, subject to one exception, being given no weight. This exception has been enunciated in terms of giving "great weight" to the tribunal (usually the trial judge) who had the opportunity to see and hear the witnesses and thus be better able to weigh their credibility on disputed issues of fact. In *Claude v. Claude*, 180 Or 62, 79, 174 P2d 179 (1946), the court said:

> "On disputed questions of fact it is the rule in this court to give weight to the findings of the trial judge in a suit in equity and not lightly to set them aside. We are not, however, bound by such findings, and, where the evidence is conflicting, we have a duty to examine the record with care for the purpose of determining the truth."

In *Liggett v. Lester*, 237 Or 52, 57, 390 P2d 351 (1964), the court said:

> "* * * We have examined the record independently, as we are required to do in all equity cases * * *."

In *Roberts v. Mariner*, 195 Or 311, 348, 245 P2d 927 (1952), the court said:

> "* * * We recognize the often-announced rule

that, in equity proceedings, this court will give great weight to the findings of the trial court upon disputed questions of fact, but, as we have also often said, such findings are not binding upon us, *and the rule itself is one of expediency only.* We have a responsibility in every case such as this to make our own independent study of the record and to arrive at our own conclusions respecting it." (Emphasis supplied.)

In *Rea v. Rea,* 195 Or 252, 261, 245 P2d 884, 35 ALR2d 612 (1952), we find:

"* * * We agree also that the decision of the trial court, when based solely on evidence introduced in open court, is subject to review and *trial de novo* in this court. We are constrained to add, however, that we have grave doubts as to whether any appellate court, acting on a cold record, is as likely to arrive at a wise decision concerning child custody, as is the trial judge who sees the parents, hears the testimony, and observes the child. It is for this reason that we have repeatedly held that the decision of the trial court is entitled to great weight in such cases. This court is ill-equipped to exercise a wise and humane discretion on a record which, of necessity, fails to disclose the subtle, but highly persuasive, evidences which are manifest to the trial judge. A wise appraisal of the character, fitness, emotional stability, affection, hostility, or motive, of the parties to a contested divorce case, who are competing for the custody of a child, or a like appraisal of the inner attitude of the child itself, requires more than can generally be made to appear on the printed page." (Emphasis supplied.)

*Omlie et ux v. Hunt,* 211 Or 472, 316 P2d 528 (1957), pointedly affirms that de novo review means trial anew on the record without regard to the findings of the trial court except with regard to issues turning on witness credibility. That case involved a contested

adoption. The judge who presided died after completion of the hearing, but before he had rendered his opinion. The parties stipulated that it should be retried upon a transcript of testimony taken at the previous trial and this was done by a domestic relations judge. The plaintiff appealed from the decree. On appeal the Supreme Court reversed, saying:

"* * * [S]ince the trial court did not have the benefit of actually seeing and hearing the witnesses at the time their testimony was given, *the usual reason for attaching weight to the trial court's finding does not exist.* Difficult as it is, this court must decide for itself whether the evidence shows willful desertion and neglect by the natural father." (Emphasis supplied.) *Omlie et ux v. Hunt,* supra, at 476-77.

We know of no Oregon statutory or judicial rule of de novo review which lies partway between the "substantial evidence" or "abuse of discretion" rule on the one hand, and the review de novo rule articulated, not only in the cases cited above, but in dozens of other opinions of the Oregon Supreme Court, many of which are summarized in the New Oregon Digest, Appeal and Error § 893(2).

We turn now to the appellate opinions governing the scope of appellate review under the Workmen's Compensation Law of 1965. *Coday v. Willamette Tug & Barge Co.,* 250 Or 39, 440 P2d 224 (1968), interpreted ORS 656.298(6) and 656.301 as requiring that judicial review be de novo. The court in disposing of the issues of that case proceeded to describe itself as the trier of fact and stated:

"* * * [W]e recognize that another trier of fact examining the evidence in the present case might reasonably reach a conclusion opposite to ours." 250 Or at 50.

Nothing in the language in *Coday* indicated that the court was adopting any standard for de novo review of workmen's compensation cases different from that enunciated in all its previous decisions dealing with de novo review in equity. In *Romero v. Compensation Department*, 250 Or 368, 440 P2d 866 (1968), the court repeated its language oft-used in equity cases about the value of seeing live witnesses in disputed fact situations:

"\* \* \* [T]he opportunity to observe the claimant and the other witnesses is of prime importance. The Hearing Officer is in a position to make this observation and we are not \* \* \*." 250 Or at 372.

However, the court then went on and said:

"\* \* \* Moreover, although we must review the record de novo, we are entitled to take into account the administrative agency's expertise which develops out of dealing with hundreds of similar cases. As has been pointed out, 'industrial commissions generally become expert in analyzing certain uncomplicated kinds of medical facts [and we would add non-medical facts also], particularly those bearing on industrial causation, disability, malingering and the like.' 2 Larson's Workmen's Compensation, § 79.53, p. 303 (1961). Further, it would seem that in the type of case we have before us, where the criteria for appraising disability is at best vague and highly subjective, the administrative agency should have some leeway in developing, if possible, a pattern of decision-making by a comparison of the many cases which are presented to it." 250 Or at 372-73.

The above language has apparently led some lawyers and some trial judges to the belief that by these words the Supreme Court has created a new form of de novo review peculiar to compensation cases. A

careful reading of *Romero* together with other pro-
nouncements of the Supreme Court on the same sub-
ject lead us to the conclusion that these beliefs are not
warranted.

We have had recent arguments addressed to us
that the language in *Romero,* to the effect that the ad-
ministrative agency should have some leeway in de-
veloping if possible a pattern of decision-making,
means either that the courts must give weight to the
administrative findings or that such findings cannot
be changed if there is substantial evidence to support
them. These interpretations ignore the language of
*Coday,* saying that the appeal statutes, ORS 656.298(6)
and 656.301, require de novo judicial review even if
such review prevents the board from working out, on
a case-by-case basis, a pattern of rules in the work-
men's compensation field. The *Romero* opinion, citing
Larson on Workmen's Compensation Law, simply
recognizes that an agency like the Workmen's Compen-
sation Board ordinarily develops an expertise in its
specialized field. It disclaims any right or duty on the
part of the court to be bound by the results of such
expertise, specifically stating, not that the court is
bound to give weight to the "administrative expertise,"
but rather, "we are entitled to take into account the
administrative agency's expertise."

In *State ex rel Cady v. Allen,* 254 Or 467, 460 P2d
1017 (1969), the court, in discussing *Romero,* said:

"* * * We did not imply that the administra-
tive findings were entitled to 'evidentiary weight.'
We held merely that in reviewing de novo the de-
gree of disability the reviewing court is entitled to
take into account 'the administrative agency's ex-
pertise which develops out of dealing with hundreds

of similar cases.' The reviewing court must decide in each case to what extent it will be persuaded by the administrative findings. Lucke v. State Comp. Dept., 254 Or 439, 461 P2d 269, decided November 19, 1969."

■ The judicial review of compensation claims is de novo on the record to the same extent that appellate review of proceedings in equity is de novo. In compensation cases the circuit court (with one exception— see n 2) is exercising the same appellate function as does the Supreme Court in equity cases. It has not only the right, but the duty to arrive at a result based on its independent judgment. In making its decision it has before it the record (i.e., the transcript of testimony and exhibits) and the findings produced by the administrative process both at the hearing officer and board levels. Whether it exercises its appellate function by first reading the record or by first reviewing the administrative findings is immaterial. In so far as the issues presented can be measured by objective criteria it should give little or no weight to the administrative findings. *Boorman v. State Comp. Dept.,* 1 Or App 136, 459 P2d 885 (1969).

■ In so far as the resolution of an issue turns upon the credibility of witnesses the court should give weight to the findings of the hearing officer who saw and heard those witnesses. *Satterfield v. State Comp. Dept.,* 1 Or App 524, 465 P2d 239 (1970); *Moore v. U. S. Plywood Corp.,* 1 Or App 343, 462 P2d 453 (1969). Nevertheless, even in the resolution of those issues the court is not bound by the findings of the hearing officer. *Lisoski v. The Embers,* 2 Or App 60, 465 P2d 888 (1970); *Lucke v. Compensation Department,* 254 Or 439, 461 P2d 269 (1969).

*Romero* and *State ex rel Cady v. Allen,* supra, tell us that in the decision-making process the court is entitled to consider administrative expertise. To us this means that prior to making a final determination the circuit court should give the same consideration to the administrative findings as it would give in any case to a judicial opinion from a source which is not binding. Put in another way, the findings are there; they have been made by a legislatively-established agency which is expected to have, by virtue of the repetitive nature of its specialized function, some expertise. They thus warrant respectful attention. We emphasize that we refer to the administrative apparatus as a whole. Consideration should not be given or withheld based upon personal opinions regarding the competency of specific individuals. *State ex rel Cady v. Allen,* supra. Nevertheless, we repeat again, the court is not bound by what has gone before; and if, in the exercise of its independent judgment it believes a different result is proper under the facts and the law it has the duty to so find.

■ Lastly, giving weight to administrative expertise means that if the record is such that the circuit court, after reviewing it, cannot say with any degree of conviction what the proper result should be, it should then defer to the administrative agency and affirm the result reached by it. This is what we believe the Supreme Court meant in the *Romero* case when it said:

> "* * * Further, it would seem that in the type of case we have before us, where the criteria for appraising disability is at best vague and highly subjective, the administrative agency should have some leeway in developing, if possible, a pattern of decision-making by comparison of the many cases which are presented to it." 250 Or at 373.

This is not a new concept of de novo review. As we have attempted to point out, appellate de novo review on the record is not a process without shortcomings.

"* * * When chancery causes are taken up for determination by this court, the judicial balance, so to speak, stands at perfect equipose. One side of the scales is labeled 'appellant,' the other 'appellee.' The testimony in the record is examined and all that is incompetent is discarded. That which remains for appellant is put on his side, and that for the appellee on his side, and if the scales are evenly balanced, or so nearly so as to leave the judges in doubt as to where lies the greater weight, then the decision of the court below is persuasive, and is allowed to stand as the correct result." *Leach v. Smith et al*, 130 Ark 465, 470, 197 SW 1160 (1917).

See also 5A CJS 603, Appeal and Error § 1663, n 29.

We turn now to the role of the Court of Appeals. Under the present statutory scheme, if either litigant is dissatisfied with the result reached by the exercise of the circuit court's appellate function he has the power to reduce the circuit court's efforts, no matter how thorough and conscientious, to an exercise in futility by requiring this court to go through the same process. When the situation calls for us to give weight to the findings of the individual who saw and heard the witnesses or to defer to administrative expertise based upon repetitive performance of specialized functions, we must look back, not to the findings of the circuit court, but to the administrative findings.[2] However,

---

[2] In cases in which the circuit judge, as provided by ORS 656.298(6), "* * * [H]ear[s] additional evidence concerning disability that was not obtainable at the time of the hearing," we of course give weight to his findings in so far as resolution of an issue may turn on the credibility of witnesses giving such evidence.

we properly may and do give respectful consideration to the findings of the circuit court before we make a final determination, just as, and for the same reasons that, the circuit court should consider the administrative findings. By the same token we cannot in any way be bound by those findings. Furthermore, in giving such consideration to those findings, we are giving consideration to the office and not to the personal experience of any individual judge, and arguments to the effect that a particular judge has had a unique pattern of past experience serve no useful purpose. Having performed our function in the manner outlined we have the duty to resolve such cases as our independent judgment dictates. If we differ with the circuit court it is not that we are more final because we are more infallible, but that we are more infallible because we are more final.

In February of 1966, claimant suffered an injury to his left hand for which he received a permanent partial disability award based on partial loss of function of a finger. While this injury interfered to some degree with his physical ability it did not prevent him from continuing his employment as a hospital maintenance engineer.

The claim with which we are here concerned arose when on June 18, 1967, while in the course of his employment as an engineer, he fell from a ladder.

Claimant made a claim for compensation for injuries resulting from the fall. Accordingly, on April 16, 1968, the Closing and Evaluation Division of the Workmen's Compensation Board made an award to claimant based on 40 per cent loss of use of his left arm.

Claimant, contending that this award was insuf-

ficient, sought and received a hearing before a hearing officer who, on October 11, 1968, increased the award to 65 per cent loss of use of an arm.

The claimant, being still dissatisfied, appealed to the Workmen's Compensation Board which, upon trial de novo on the record, affirmed the findings of the hearing officer on January 8, 1969.

The claimant, being still dissatisfied, appealed to the circuit court which, on July 28, 1969, after de novo trial on the record, increased the award to 90 per cent of loss of an arm by separation for an unscheduled disability.

The direct responsibility employer, being dissatisfied with this result, appealed to this court, contending that the disability resulting from the fall is partial loss of use of the arm (a scheduled disability), rather than an unscheduled disability, and, further, that the award made by the circuit court was excessive in view of the claimant's actual disability.

■ The injury was to the shoulder. It resulted in surgery's being performed on the shoulder some five months after the fall. The uncontroverted evidence is that claimant's present disability is caused by the impairment of shoulder function. An injury to a shoulder is an unscheduled injury. *Audas v. Galaxie, Inc.*, 2 Or App 520, 467 P2d 654, Sup Ct *review denied* (1970).

This distinction is not just a matter of semantics. Under the applicable statute, ORS 656.214, as it read at the time of the injury, the maximum amount that could have been awarded claimant if the injury were treated as a scheduled injury, i.e., an injury to his arm, even if he had been found to have had a 100 per cent

loss of use of the arm, was less than he could have been awarded if the injury were classified as an unscheduled injury.

■ A factor in the determination in the amount of disability to be awarded is the actual physical impairment resulting from the injury. Physical impairment, however, is not the only pertinent factor. Workmen's compensation is based upon loss of ability to earn. Some physical impairment may result in no earning impairment; other physical impairment may drastically reduce earning capacity. In the case at hand one doctor estimated that the physical impairment of the use of claimant's upper left extremity to be 45 per cent; another doctor estimated it to be 63 per cent. The claimant testified that he had to keep the arm in a sling to relieve pain in his shoulder. He testified to loss of strength, loss of sense of touch, and loss of ability to move his arm. Claimant's former supervisor testified that claimant was not capable of performing his duties as an engineer after the injury in question, although his work had been excellent prior to the accident.

■■ There was some evidence that claimant's physical impairment might have been lessened if he had more conscientiously followed the advice given by various doctors who treated him, but all of the medical evidence indicates that the pain which prevented him from doing so was very real. One of the doctors said that the claimant's disability was in part functional; this same doctor, however, disclaimed any inference of malingering by saying that, functional or not, the pain was real to the claimant. We know of no rule that functional disability, as distinguished from malingering, is not compensable when it results from an actual injury. Further, claimant's reluctance to ignore the

pain which was very real to him is understandable in light of the fact that under one doctor's erroneous advice he attempted to work for five months with a shoulder which another doctor later diagnosed as requiring immediate surgery.

There is little doubt that claimant's capacity to earn has been severely limited. At the time of his injury claimant was earning approximately $7,000 a year. He has not worked since the surgery of November 1967. He is physically incapable of working as an engineer. He is 61 years old, has average intelligence and only a seventh-grade education. His only training is in fields related to his past employment—an employment for which he no longer has the physical qualifications. One examining physician, and a psychologist who examined him for the purpose of vocational rehabilitation, felt that he was unemployable.

While we do not think the evidence supports the conclusion that he is permanently and totally disabled, it appears unlikely that any employment he may be able to obtain will be nearly as remunerative as the position he held at the time of his injury.

We are required to consider the previous disability award when determining the award for claimant's present disability. ORS 656.222. Taking into account claimant's physical impairment, loss of earning capacity, and the award for his previous injury, we believe claimant should be awarded compensation for an unscheduled injury equal to 90 per cent loss by separation of an arm. This is the amount awarded by the circuit court.

The hearing officer and board determinations were both made prior to the decision in *Ryf v. Hoffman*

*Construction Co.,* 254 Or 624, 459 P2d 991 (1969), which held that loss of earnings was a consideration in disability awards. Prior to that decision the administrative agency had not considered this factor in making awards. See Workmen's Compensation Board: Bull No. 59. This may be the reason for the difference between the administrative award and the judicial award.

Affirmed.

### ON REHEARING

Workmen's compensation proceeding. The Circuit Court, Multnomah County, Pat Dooley, J., awarded workmen's compensation for unscheduled injury and direct responsibility employer appealed to Court of Appeals, where award was affirmed, 471 P.2d 831. On rehearing, the Court of Appeals, Schwab, C. J., held that workman who sustained injury prior to July 1, 1967, manifesting itself in stiffness and pain in shoulder and partial loss of use of left arm was entitled to award of compensation for unscheduled injury and award was not to be computed by making one award for that part of disability due to shoulder injury and a separate award for that part of disability due to resultant loss of use of arm.

*William L. Hallmark*, Portland, argued the cause for appellant on rehearing. With him on the brief were McMenamin, Blyth, Jones, Joseph & Lang, Portland.

*John J. Haugh*, Portland, argued the cause for respondent on rehearing. With him on the brief were Pozzi, Wilson & Atchison, Portland.

Before Schwab, Chief Judge, and Foley, Fort and Branchfield, Judges.*

SCHWAB, C. J.

■ As pointed out in our original opinion, the workman in this case injured his left shoulder. This injury manifested itself in stiffness and pain in the shoulder. An additional indirect result of the injury was partial loss of use of the left arm. We affirmed an award of compensation for an unscheduled injury equal to 90 per cent loss by separation of an arm.

The crux of the employer's argument on rehearing is that this court erred in affirming an unscheduled disability rating when none of the evidence indicated a disability in the shoulder area. The employer's argument is that since all of the evidence reflected a disability which manifested itself in the arm only, and none of the evidence indicated a disability to the shoulder, the workman should have been confined to an award for loss of use of a scheduled area of the body (the arm). We do not find such to be the fact.' The arm itself was not injured. The injury resulted in little or no pain in the arm itself. The stiffness and pain were in the shoulder. For all practical purposes the loss of use of the arm was due solely to the inability to manipulate the shoulder. We adhere

---

* Langtry, J., did not participate in this decision.

to our decision in *Audas v. Galaxie, Inc.,* 2 Or App 520, 525, 467 P2d 654, Sup Ct *review denied* (1970), in which we held:

> " 'The shoulder is an unscheduled part of the human body * * *. An industrial injury to the shoulder that results in permanent partial disability in the shoulder entitles the workman to an award for unscheduled permanent partial disability.' *In the Matter of the Compensation of C. J. Tourville, Claimant,* Multnomah County Case No. 334-575 (1968)."

The employer then argues that if we find as a fact that the injury to the shoulder was an unscheduled injury, in measuring and making an award for the workman's resultant disability we must compute it by making one award for that part of his disability due to the shoulder injury and a separate award for that part of his disability due to the resultant loss of use of the arm. The accident in question happened prior to July 1, 1967. The statutory provision in effect at the time of the accident provided that in all cases of unscheduled injury resulting in permanent partial disability the number of degrees of disability was to be computed by determining the disabling effect of such injury as compared to the loss of a scheduled member of the body not exceeding, however, 192 degrees; 192 degrees was and is the number of degrees provided for loss of an arm above the elbow by separation. This is the highest number of degrees authorized for the loss by separation of any member of the body (limb or portion thereof). In support of his position the employer cites several cases, the most closely analogous of which is *Walker v. Compensation Department,* 248 Or 195, 432 P2d 1018 (1967). In that case the plaintiff had injured his back. As a result of the injury

he had disability in his back and pain in his leg which was found to be radiation pain coming from his back down into his thigh. The court there held that since there was evidence that the injury to the back caused disabling pain in the leg a verdict awarding benefits for both an unscheduled injury to the back and a scheduled injury to the leg was proper. The *Walker* case is distinguishable from the case at hand. In *Walker* the result of the accident was disabling pain in both the back and the leg. Here the disabling pain and stiffness was confined to the shoulder. The arm was affected only in the sense that the shoulder manipulates the arm, and a disabled shoulder is restricted in its ability to do so. The case at hand is more analogous to *Graham v. State Ind. Acc. Com.*, 164 Or 626, 102 P2d 927 (1940), in which the court held:

> "* * * Where a workman's injury is confined to his thumb and there are no unusual or unexpected complications attending injury, compensation for disability resulting from such injury cannot be made on the basis of an injury to the hand * * *." 164 Or at 628.

The employer apparently raises this point because he contends that while we must take into consideration loss of earning capacity in the case of an unscheduled injury, *Ryf v. Hoffman Construction Co.*, 254 Or 624, 459 P2d 991 (1969), we may not do so in the case of a scheduled injury. Despite our opinion in *Trent v. Compensation Dept.*, 2 Or App 76, 466 P2d 622 (1970), there may be some merit in this contention. However, we need not reconsider that holding in this case in view of our finding that here the entire award of compensation must be based on an unscheduled injury. We further note that as to all workmen's compensation claims arising out of accidents which occurred subse-

quent to July 1, 1967, the matter of making one award for an injury to an unscheduled portion of the body, and another award for the indirect consequences of that injury to a scheduled member,[1] is moot.[2] The current statutory provision no longer confines compensation for unscheduled disability to an amount not to exceed that which might be awarded for the loss of a member. The present law, ORS 656.214, after setting forth the awards to be made for loss of use or loss by separation of various members of the body, provides in subsection (4):

> "In all other cases of injury resulting in permanent partial disability, the number of degrees of disability shall be a maximum of 320 degrees determined by the extent of the disability compared to the workman before such injury and without such disability."

Former opinion adhered to.

---

[1] See not only Walker v. Compensation Department, 248 Or 195, 432 P2d 1018 (1967), but also Kajundzich v. State Ind. Acc. Com., 164 Or 510, 102 P2d 924 (1940).

[2] See supplemental opinion in Foster v. S.A.I.F., handed down today.