Argued October 28, affirmed December 9, 1974

SEABERRY, *Respondent, v.* STATE ACCIDENT
INSURANCE FUND (No. 400550), *Appellant.*
528 P2d 1103

*Jim G. Russell,* Assistant Attorney General, Salem, argued the cause for appellant. With him on the brief were Lee Johnson, Attorney General, and W. Michael Gillette, Solicitor General, Salem.

*Keith E. Tichenor,* Portland, argued the cause for respondent. With him on the brief was Pozzi, Wilson & Atchison, Portland.

Before SCHWAB, Chief Judge, and THORNTON and TANZER, Judges.

TANZER, J.

The State Accident Insurance Fund appeals from a circuit court order awarding claimant permanent total disability. The Fund asks that the original determination order of March 23, 1973, which granted 25 percent unscheduled low back disability[1] and was affirmed by the hearing officer and the Work-

---

[1] This was in addition to earlier awards resulting from the same injury and brought the total award to 50 percent unscheduled disability and 15 percent scheduled disability for loss of use of the left leg.

men's Compensation Board, be reinstated. The sole issue is the extent of disability. No novel legal issues are presented; we are asked to act in our capacity as fact-finder. *Hannan v. Good Samaritan Hosp.*, 4 Or App 178, 471 P2d 831, 476 P2d 931, *rev den* (1971).

Claimant, 47, left school in the eighth grade and has done heavy labor most of his life. He was first injured in 1962 as a construction worker and was awarded 10 percent permanent disability for loss of use of his left leg and 20 percent unscheduled permanent disability for injury to his back.

Claimant returned to heavy labor and in 1967 received a second back injury. He was referred to Dr. Edward Kloos, who performed a myelogram and diagnosed a herniated disc. As a result, a laminectomy was performed at the L3 level.

Claimant was retrained as a barber between January and October of 1968. The Physical Rehabilitation Center, in approving this course of training, noted that claimant could not return to heavy labor or engage in heavy lifting, excessive twisting, stooping or repetitive bending, that he tested at the upper borderline levels in both verbal and non-verbal intelligence, that he desired training, and that his appearance and personality were positive factors.

Claimant returned to Dr. Kloos on February 12, 1968 and complained of cramps in his left calf after a day's training. On February 27, 1968, claimant complained to Dr. Kloos that the pain in his back, hips and groins had become so severe that he had been unable to continue with his barber college work. Dr. Kloos stated that claimant's complaints were a result of having been on his feet eight hours a day for six days a week.

Claimant's condition improved and he returned to barber college. He attended steadily until June 15, 1968, when symptoms recurred. Dr. Kloos concluded:

> "There is very little from an objective standpoint to explain this man's present symptomatology. I am inclined to believe he may have some aggravation of a chronic low back problem, but also feel that there is a good possibility that he magnifies his symptoms considerably. * * *"

In a later report, Dr. Kloos went on to say that claimant was belligerent and that he would continue to have complaints and relate them to his low back problem. Dr. Kloos then resigned from the case.

On August 28, 1968, Dr. Nathan Shlim, an examiner for the Board, found no significant abnormality but considerable functional overlay, with some anxiety. On November 6, 1968, claimant consulted Dr. Norman Logan, an orthopedist. Dr. Logan diagnosed degeneration of the lumbosacral joint, post-laminectomy. He placed claimant on a schedule of exercises, prescribed a brace and sent claimant back to training.

Claimant completed the training course and began work as a barber in February of 1969. Eventually, he returned to Dr. Logan with complaints of increasingly severe back and leg symptoms and on December 28, 1970 he was hospitalized.

Dr. James Schimschock, a neurologist consultant, noted complaints of hypalgesia, not in anatomic distribution, and recommended myelography. The myelogram, performed on March 23, 1971, disclosed a large herniated disc at L4-5 and a laminectomy, therefore, was performed on April 9, 1971.

Claimant has not returned to work since the second laminectomy. He has continued to complain of

low back and leg pains. On December 13, 1972, Dr. Logan diagnosed claimant's condition as lumbar nerve root compression, left and right, at the L4-5, L5-S1 level with residual peripheral neuritis. Dr. Logan noted that claimant could only be on his feet for 30 to 60 minutes at a time. He concluded that claimant could not return to work involving standing, bending or lifting and was most likely permanently and totally disabled.

On December 28, 1972, Dr. Toon examined claimant for the Fund. He recommended a back evaluation program, to include both physical and occupational therapy, basic psychological testing, referral to the Vocational Rehabilitation Division, new X-rays of the lumbosacral spine, and referral to the Back Evaluation Clinic.

Psychological evaluations were conducted from December 29, 1972 through January 12, 1973. According to these evaluations, claimant is functionally illiterate, has an I.Q. of 74, and operates at borderline levels in both verbal and non-verbal intelligence. Dr. Hickman, the examining psychologist, found that claimant had deteriorated a great deal since 1968 and was quite likely experiencing genuine physical distress. He concluded that claimant had a moderately severe psychopathology, apparently attributable to his physical problems, and that the prognosis for return to gainful employment appeared rather poor. Dr. Hickman also stated that counseling was indicated but that claimant was not amenable to counseling and it should not, therefore, be attempted.

According to a report by Dr. Toon dated January 12, 1973, claimant was considered uncooperative and poorly motivated in physical therapy. In addi-

tion, he appeared to tolerate the occupational therapy poorly and to be a resistive man who would rather put in his time than try to make an effort to improve his condition.

Claimant was seen by the Back Evaluation Clinic on February 9, 1973. The clinic noted claimant's statement that he could not stand for over 20 or 30 minutes without experiencing burning and itching in the feet and low back pain. They concluded on the basis of their examinations, however, that claimant suffered from post-laminectomy syndrome with transitional L-5, S-1 vertebra, that there had been a moderate loss of function, that the claim was stationary and that claimant could return to work as a barber.

Dr. Logan responded to the clinic report, agreeing in part but disagreeing with the recommendation that claimant return to barbering. He again noted claimant's inability to stand for any significant period of time and recommended that claimant be trained for less strenuous work. Finally, he concluded that claimant should be considered totally disabled "until he begins to show that he can do something."

■ We conclude that claimant's disability prevents him from working at the trade of barbering. He has received two serious back injuries, the first in 1962 and the second in 1967. Following the 1962 injury he returned to work as a heavy laborer. Subsequent to the 1967 injury, he has had two laminectomies. He has consistently complained of leg and back pain and yet he positively pursued and completed his vocational retraining as a barber. While the Back Evaluation Clinic's report recommends that claimant return to work as a barber, claimant's treating physician, who performed the most recent laminectomy, is of the opin-

ion that claimant is totally disabled. Furthermore, claimant is unable to stand for significant periods of time as required in a work situation within his range of competence.

■ We find that claimant is permanently and totally disabled under the "odd-lot" doctrine. While he is not altogether incapacitated, he is nevertheless so handicapped that he is not able to obtain regular employment in any recognized branch of the labor market. *Deaton v. SAIF,* 13 Or App 298, 509 P2d 1215 (1973). Claimant can no longer perform, the heavy manual labor which he has done for most of his life; nor can he continue in the trade of barbering, for which he retrained. These inabilities, coupled with his limited education, training, experience, intelligence and aptitudes, place him prima facie in the "odd-lot" category. *Cf. Ainsworth v. Joslyn Mfg. & Supply,* 11 Or App 154, 501 P2d 1301 (1972); *Mansfield v. Caplener Bros.,* 10 Or App 545, 500 P2d 1221 (1972); *Jenness v. SAIF,* 8 Or App 95, 493 P2d 73 (1972). It was incumbent on the Fund, therefore, to show that some kind of suitable work is regularly and continuously available to the claimant. *Swanson v. Westport Lumber Co.,* 4 Or App 417, 479 P2d 1005 (1971). The record contains no such evidence.

■■ The Fund questions claimant's motivation to improve his situation. They point to his uncooperative attitude in regard to counseling and physical and occupational therapy. Motivation becomes a factor only if claimant's physical condition and his inability to adapt to alternative employment do not place him prima facie in the "odd-lot" category. *Deaton v. SAIF,* supra. We note, however, that claimant has, over the years, been a diligent worker, resilient after each set-

back. Following his first back injury in 1962, claimant returned to work as a heavy laborer. After the 1967 injury, he retrained with a highly positive attitude as a barber despite his limited abilities and despite frequent severe back and leg pain. Claimant's recent uncooperative attitude appears to be a manifestation of his psychopathology which, as Dr. Hickman indicated, was directly attributable to his physical problems. A broken body can cause a broken spirit. This should not prevent a finding of permanent and total disability where claimant is otherwise unable to re-enter the work force.

Affirmed.