Argued March 19, affirmed April 26, reconsideration denied May 12, petition for review denied June 15, 1976

ROOKARD, INC., *Appellant,*

*v.*

MEYERS et al, *Respondents.*

(No. 75-5731, CA 5662)

548 P2d 1318

*Lyle C. Velure,* Medford, argued the cause and filed the brief for appellant.

*Allan H. Coons,* Eugene, argued the cause for respondent. With him on the brief were Coons, Cole & Anderson, Eugene.

Before Schwab, Chief Judge, and Langtry and Thornton, Judges.

THORNTON, J.

**THORNTON, J.**

The employer appeals from the decision of the circuit court which held that the three minor stepchildren of a deceased employe were substantially dependent upon him at the time of his death in covered employment and that the children were therefore entitled to death benefits. ORS 656.002(5).

The wife of the deceased, Mrs. Gloriajean Meyers, has three children from her prior marriage to Gerald Haffner. That marriage was dissolved in December of 1973. The decree requires Mr. Haffner to pay $225 per month in child support, which he has done.

Mrs. Meyers married Bruce Meyers, the deceased, in March of 1974, and they lived together with her three children until his death in December of that year.

Shortly after the death of Mr. Meyers, Mrs. Meyers applied for death benefits, both for herself and for her three children. The claim was allowed as to her, but denied as to her three children on the ground that they were not substantially dependent upon their stepfather since their natural father was paying child support. Mrs. Meyers requested a hearing and the hearings referee allowed the entire claim. Employer appealed to the Workmen's Compensation Board and later to the circuit court, losing at both levels. Employer now appeals to this court.

The amount of support that a stepfather must contribute before the stepchildren are substantially dependent upon him varies with the circumstances, as does the amount of support that the children can receive from their natural father and still be substantially dependent upon their stepfather. No exact dollar or percentage figure can be established; the question must be considered on a case-by-case basis. Professor Larson states:

"* * * A showing of actual dependency does not require proof that, without decedent's contributions,

claimant would have lacked the necessities of life, but only that decedent's contributions were relied on by claimant to maintain claimant's accustomed mode of living." 2 Larson, Workmen's Compensation Law 11-58, 11-60 to 11-61, § 63.11 (1976).

The evidence in this case is that Mr. Meyers' net income of $410 per month went into a common fund along with the $225 per month child support Mrs. Meyers received from her former husband and the $55 per month welfare she received.[1] It is undisputed that virtually all of this $690 per month family income was expended on the family as a whole. No records were kept as to exactly how much was spent on each member of the family.

■ It is clear from the evidence that the children enjoyed a standard of living somewhat above that which the child support and the welfare alone would allow. The family took frequent trips to the beach and in general engaged in the usual family-type activities such as going on picnics, to movies, etc. One of the boys had a mini-bike and an expensive rubber raft. Such items and activities cannot be indulged in on an income near the bare subsistence level. From this and the rest of the evidence we find in our de novo review, we conclude that the children were therefore necessarily and substantially dependent upon the deceased.

Affirmed.

LANGTRY, J., dissenting.

Claimant has the burden of proving her claim that the children were "substantially dependent" on their stepfather preceding his death. In our de novo on-the-record determination of the facts as to whether she has done so, we give "weight" to the findings of the referee who saw and heard the witnesses, but we are not bound thereby. *Hannan v. Good Samaritan Hosp.,* 4

---

[1] The evidence is unclear as to how much Mrs. Meyers received from welfare. As we read the record, she received $280 per month but that to do so she had to assign her child support payments, leaving a net gain of $55 per month.

Or App 178, 192, 471 P2d 831, 476 P2d 931 (1970), Sup Ct *review denied* (1971). My review of the record, governed by this rule, leaves me unconvinced that claimant carried her burden of proof by a preponderance of the evidence.

Mrs. Meyers testified family expenses during her nine-month marriage to Mr. Meyers were approximately $490 per month. The evidence concerning Mr. Meyers' take-home monthly income during the same time showed it was $409. Thus, $81 monthly presumably came from somewhere else. The evidence shows Mrs. Meyers was getting $225 from her former husband for the children, plus as much as $110 from welfare.

The welfare worker was called by Mrs. Meyers to testify to welfare payments during that nine months. This worker testified that $220.38 would be the cost of the children's food and shelter by welfare's standards. She testified that $182.79 would be what welfare would consider "under the circumstances of this case" to be adequate for shelter, food, clothing, personal incidentals and household supplies for the children. On cross-examination, when the employer's attorney was trying to find out what actually had been paid by welfare for the family, she testified that the last check on November 1, 1974 from welfare to Mrs. Meyers was $110. Both counsel tried without success to find out the period of time that was for. But the welfare worker said:

"They were on every month from 4-25 through until when the case was closed 12-31 [she had already said the last check was on November 1 for $110], except for the month of August. They were suspended [for August] and there was no cash payment or anything during that time."

She testified the grant was $284 per month at the end. She testified it was $218 per month, apparently, sometime earlier than the end. She also testified that there were deductions from the grant "and so she was only getting like sixty-one dollars grant amount to supple-

ment it." "It" apparently means other sources of income.

There was documentary evidence that on at least three occasions from April to November 1974 in order to get the welfare aid Mrs. Meyers stated to welfare in writing that Mr. Meyers was not in the home (and presumably was then contributing nothing to the children's support). He really was in the home in August, and they were cut off welfare for that month.

It was only after she learned there was a possibility of getting a substantial amount of workmen's compensation for the children until age 18 that she went to welfare and told them she had been lying about Mr. Meyers not being in the home. Her first lawyer, she testified, told her she would have to make up her mind as to whether she would go to welfare and tell about her falsity. She said that she thought about it for about 15 minutes and came back to tell him to tell welfare. He then made the contact for her. Later she apparently changed attorneys.

She and Mr. Meyers were having a very stormy marriage, even to the point of having the police called on account of their fighting.

To say the least, there is a serious question about what occasion it was when she was false—that is, was it when she was getting the welfare grants or when she was trying to shake herself loose from having had them? Recalled as a witness, after the welfare worker had thoroughly confused the record, her attorney asked her:

> "How much more than the two hundred and twenty-five dollars [from her ex-husband] did you get [from welfare], do you remember?"

She answered:

> "It was—I think it was thirty dollar check, twice a month, or fifteen dollar check twice a month. I think it amounted somewhere between thirty, forty, fifty, sixty dollars a month at the time and I wasn't—at the time I

was not aware that the stepfather grants were not available."

If the welfare worker had been required to tell what welfare had actually paid each month, there would be more to go on. The one concrete thing we do know is that one check was for $110, and there was something paid in all but one month. I am left in doubt whether a substantial part of the children's support was coming from Mr. Meyers. By welfare's estimate of the cost of the three children to the home, it required at the most $220. Their father was paying $225, and welfare was paying somewhere between $30 and $110 for them. Meyers was taking home only $409 per month. The children's own father testified that he had the children with him on almost all Sundays and that his insurance paid substantial dental bills for one of them, so it is questionable whether Mr. Meyers was as generous with them as claimed.

I do not consider claimant's burden of proof to have been sustained.