Argued May 25, affirmed July 15, 1971

WILSON, *Appellant, v.* GILCHRIST
TIMBER CO., *Respondent.*

487 P2d 104

*Donald R. Wilson,* Portland, argued the cause for appellant. With him on the brief were Pozzi, Wilson & Atchison, Portland.

*Scott M. Kelley,* Portland, argued the cause for respondent. With him on the brief were Leo Levenson, Ray Mize, and Mize, Kriesien, Fewless, Cheney & Kelley, Portland.

Before SCHWAB, Chief Judge, and LANGTRY and FOLEY, Judges.

LANGTRY, J.

Claimant appeals from an award by the circuit court of 75 per cent loss of use of a leg and 60 per cent loss of an arm by separation for unscheduled injuries as a result of an on-the-job injury incurred when a log rolled upon him. The hearing officer had made the same award as did the circuit court, but the Workmen's Compensation Board had substantially reduced it.

The acetabulum, which is the cup-shaped depression on the external surface of the large pelvic bone into which the head of the femur fits, suffered a comminuted fracture. Repair was by open reduction, using metallic pins. The sciatic nerve was severely stretched. The claimant suffers substantial pain and burning sensations in the left leg, and persistent hip and back pain. He can hobble around without a cane, but uses one most of the time.

Claimant seeks a permanent total disability award, asserting that he is unable to engage in any gainful and suitable occupation in view of his injuries, his age of 51 years at the time of the accident, and a lack of schooling and intellectual capacity to learn a calling which would produce notable income. His rate of pay as a timber faller at the time of the injury in 1966 was $6.89 per hour.

The open reduction was performed by Dr. Wm. D. Guyer in Bend, Oregon, who sent him to Dr. Charles A. Fagan, orthopedist, for further treatment. On September 23, 1968, Dr. George W. Cottrell, an orthopedist who examined him for the defendant, said:

"* * * The hip joint seems to be much better than one would anticipate considering the severity of the injury. At least at this time he has a very

good result and he should be able to perform useful work * * *."

Claimant had been sent to Dr. William L. Murphy, a psychologist, who made a thorough-going examination of him and reported on December 24, 1968:

"The prognosis for restoration and/or rehabilitation in this case remains rather guarded in view of this man's moderately advanced occupational age, as well as a limited formal education and general lack of academic aptitude."

In June 1968 the defendant had been sent to the Physical Rehabilitation Center of the Workmen's Compensation Board. In succeeding reports of him, it was said:

"* * * Psychologically, he is considered a poor to fair candidate for vocational rehabilitation.* * * Although he has a significant degree of physical disability, he is not considered to be totally and permanently disabled."

This report said that he had "some relatively good aptitudes, especially in the mechanical area." In the closing report it was stated that the patient was discharged "at the request of a therapist who said this man has been most uncooperative and a trouble-maker and had made no effort to help himself while here."

Dr. Fagan referred claimant to Dr. Henry E. Storino, a neurologist, for evaluation. On April 4, 1968, Dr. Fagan stated:

"* * * I would have to evaluate him as 100% loss of the left lower extremity secondary to his injury. I believe that this man would like permanent and total disability. However, at this time with the Division of Vocational Rehabilitation help, I do not think that he is completely and totally disabled, and certainly if this is the case, perhaps a

myelogram should be accomplished to eliminate any back cause of his sciatica and perhaps he should have hip fusion. However, neither of these things are indicated at the present time with his present attitude."

At least a year previously, Dr. Fagan had said, "probably a hip fusion would be the ideal thing." Dr. Storino, after an examination, in a report received on August 21, 1967, said that the left lateral femoral cutaneous nerve of the thigh possibly had been partially severed. He said:

"* * * I think it might be worthwhile to block the lateral femoral cutaneous nerve to see if it gives the patient any relief * * *."

Later, in a report of October 22, 1969, after further examination, Dr. Storino said:

"* * * I was going to inject the left lateral cutaneous nerve of the thigh just below the superior iliac spine, but the patient refused the procedure.

"* * * * *

"I am becoming somewhat concerned about this patient's attitude, and, as he mentions, he is 'disgusted with the whole deal'. He is quite mentally depressed, more or less has given up, and there is moderate intake of alcoholic beverages. In refusing a simple Xylocaine diagnostic block, I cannot help but raise the question of 'does this patient really want to be helped?'."

In late 1968 the claimant went to the Rinehart Clinic for therapy. Dr. R. E. Rinehart reported:

"* * * Mr. Wilson's complaints are largely a result of residual spasm of muscles associated with his left hip joint. This muscle spasm is producing weakness and pain in his hip and leg; compression neuropathy of left sciatic and lateral femoral ataneous nerves; and degenerative changes in his

left hip joint. Furthermore he is a habitually tense individual. * * * This habitual tension, among other things, produces progressive fatigue and muscle spasm which will continue to aggravate and worsen his present condition.

"* * * * *

"* * * After four treatments he has informed me that he experiences transient partial relief after therapy. We can anticipate that this transient relief will gradually become permanent if these measures are continued * * *."

The claimant discontinued his treatments with Dr. Rinehart. In November 1969, which was nearly three years after he first treated the claimant, Dr. Fagan reported:

"* * * His findings are exactly the same as they were one year ago. He is no better or no worse * * *."

Dr. Calvin H. Kiest, orthopedist, examined claimant on two occasions, in February of 1968 and August of 1969, for evaluation purposes. Excerpts from his report are:

"* * * He has made no effort to find other types of work and seems almost pathologically satisfied with his present condition. He has repeatedly told me he has no intention or desire to hunt for other types of work and is making no plans for future vocational change.

"* * * * *

"* * * He appears to be genuinely bewildered and confused by his condition, and has mentally accepted early retirement.

"* * * * *

"* * * Objectively this man has had a decrease in his ability to function as far as his left hip is concerned in the past 18 months. He has had essentially no change as far as the continuing sciatic

nerve irritation and parasthesias [sic] are concerned.

"*  *  *  *  *

"*  *  * A hip fusion has been considered for this man over the past three years period of time, and, probably wisely, this has not been done. * * * [E]ven with a hip fusion he will continue with his sciatic stretch parasthesias [sic] and pain, which is really the factor that is causing him to discontinue work and not be able to function.

"This man is absolutely incapable of working in the woods or in any heavy occupation now, or in the forseeable [sic] future. Theoretically he should be able to function in a clerical or sedentary job, but by background, education, training and aptitude this man is not fitted in any way for this type of work. This man is psychologically retired from the work force and this makes his condition worse but he has sufficient organic, objective, physical handicaps to make his decision to retire from logging not only practical but mandatory. In practical application, this man is a total and permanent disability case."

We note that in all of his medical contacts, whether it was his own or the employer's doctor reporting, claimant's refusal of rehabilitation measures, and his negative attitude, were given prominence. Claimant testified before the hearing officer, and again briefly in circuit court, relating his unsuccessful efforts to obtain employment since the first hearing. A question of credibility was involved. The hearing officer and the circuit judge, each of whom came to the same conclusion on the merits of the claim, had an opportunity to observe claimant.

In other recent cases where, with somewhat similar injuries and other circumstances involved, we have allowed permanent and total disability, we have

noted that the claimant was cooperative in seeking rehabilitation in an effort to rejoin the work force. *Swanson v. Westport Lumber Co.,* 4 Or App 417, 479 P2d 1005 (1971) ; *Cooper v. Publishers Paper,* 3 Or App 415, 474 P2d 27 (1970) ; *Dalton v. Cape Arago Lumber Co.,* 4 Or App 249, 478 P2d 433 (1970). In the case at bar the claimant claims to have sought work, but he has refused measures that might restore him to the physical ability to work. Doctor Kiest reported that claimant said that he had no plans to work again. This attitude may well be the logical product of the severe injury and the quandary of the doctors as to the medical measures that should be taken. For this reason the determination of the claim of permanent and total disability is very close. But when Dr. Rinehart, whom claimant himself chose, apparently began to make progress with the symptoms, claimant abandoned the treatments.

Under these circumstances, we think that we concur in the findings of the hearing officer and circuit judge, who had the reports we have, plus the opportunity to observe the claimant. *Hannan v. Good Samaritan Hosp.,* 4 Or App 178, 471 P2d 831, 91 Adv Sh 903, 476 P2d 931 (1970), Sup Ct *review denied* (1971).

Affirmed.