Argued December 23, 1976, reversed and remanded January 17, 1977

## ZEHR, *Appellant,*
### *v.*
## STATE ACCIDENT INSURANCE FUND,
### *Respondent—Cross-Appellant.*
### (No. 46844, CA 6604)
#### 558 P2d 848

David W. Hittle, Salem, argued the cause for appellant—cross-respondent. With him on the briefs were Dye & Olson and Rolf Olson, Salem.

Kevin L. Mannix, Assistant Attorney General, Salem, argued the cause for respondent—cross-appellant. With him on the brief were Lee Johnson, Attorney General, and W. Michael Gillette, Solicitor General, Salem.

Before Schwab, Chief Judge, and Thornton and Tanzer, Judges.

TANZER, J.

**TANZER, J.**

This is a workmen's compensation appeal in which the claimant sought benefits for a condition of the wrist known as carpal tunnel syndrome. The State Accident Insurance Fund (the Fund) denied the claim. The referee found that claimant's condition was compensable and that the Fund's denial was unreasonable. The referee awarded the claimant attorney fees and a penalty of 25 percent of all compensation. The Workmen's Compensation Board affirmed the compensation, reduced the penalty to 10 percent and awarded attorney fees for representation before the Board. The Fund appealed to the circuit court which affirmed the Board and the referee regarding the compensation, reversed them as to penalties, reduced the attorney fees awarded for representation at the hearing, and refused to award attorney fees for representation on appeal. The claimant appeals regarding attorney fees and the reduction of penalties. The Fund cross-appeals, asserting that the claimant's condition is not a compensable injury.

The cross-appeal presents the threshold issue of whether claimant's present condition is causally related to the industrial injury. We review de novo on the record, *Hannan v. Good Samaritan Hosp.*, 4 Or App 178, 471 P2d 831, 476 P2d 931 (1970), *rev den* (1971), and claimant has the burden of proof of causation. *Martin v. SAIF,* 22 Or App 282, 538 P2d 943 (1975); *Roberts v. SAIF,* 18 Or App 590, 526 P2d 445 (1974).

Claimant, then a 19-year-old woman, was employed as a meat trimmer which required repetitive finger movement in a cold atmosphere. She developed symptoms which, on November 21, 1972, her physician diagnosed as "trigger finger" (hooking) of the right ring finger with a small ganglion at its base. On December 2, 1972, the ganglion was excised by another physician. The Fund accepted the claim as a

[ 183 ]

compensable injury, and the pain, swelling and locking continued.

On May 2, 1973, claimant's physician, an orthopedist specializing in surgery of the hand, performed surgery to release the hooking of the right ring finger and to excise a second ganglion.

On May 26, 1973, claimant, riding a motorcycle, collided with an automobile and was thrown or fell to her right side. The hospital emergency room treatment records indicate, among other things, abrasion to her right hand, elbow and index finger. Claimant testified that she experienced no other change in the condition of her hand immediately following the motorcycle accident.

On June 20, 1973, the treating physician found the claimant to be asymptomatic and her condition to be stationary. She had been awarded temporary total disability by the Fund and her claim was closed. There is no challenge to that award. In July, claimant experienced cramping, discomfort and stiffness of her right hand. On July 27, her physician diagnosed the condition of her hand as "carpal tunnel syndrome," an inflammation of a nerve of the right wrist which he concluded resulted from the healing process following the prior surgery.

■ The dispositional fact issue is whether the wrist condition is caused by the earlier finger injury and surgery. We find that the claimant has not carried her burden of proof on this issue.

There is evidence from three physicians. Dr. George Harwood, a medical consultant for the Fund, reviewed the reports of claimant's symptomatology and concluded from the literature that:

> "* * * I can see no way in which a trigger finger problem (some 4-5″ away) can bring about this compression back in the wrist."

Dr. Mark A. Melgard, a neurological surgeon, examined the claimant on February 12, 1974, appa-

rently for the Fund. Dr. Melgard concluded that the claimant presented "a very peculiar set of symptoms" to be diagnosed as carpal tunnel syndrome. While his report is not direct, it was accurately characterized by the referee as expressing serious doubt regarding the diagnosis of carpal tunnel syndrome and the conclusion that it results from the prior injury and surgery.

The treating physician, Dr. Monty R. Ellison, concluded in his reports and in his direct testimony that the claimant's wrist symptoms were the result of inflammation caused by the healing process following the surgery to release the right ring finger. He was aware during his examination of June 20, 1973, of the intervening motorcycle accident and at that time did not note any symptoms in the hand arising from it. After his direct testimony, however, he was shown for the first time the hospital emergency room records reflecting the extent of injuries from the motorcycle accident and, based upon that new information, he withdrew his opinion as the following excerpts from his testimony demonstrate:

"CROSS EXAMINATION

"* * * * *

"A. * * * With a report like that I think you can assume that there was a substantial contusion type injury to the right arm, leg, hand and foot and I think that could precipitate what we're talking about.

"Q. Nobody told you about this?

"A. No sir, not that I recall.

"Q. To the extent of a reasonable medical probability, that could be the cause of the subsequent problems this lady has had in her hand?

"A. Yes sir, I think it could.

"* * * * *

"Q. Now, as far as the prior surgery making Miss Zehr's right hand more susceptible to injury, Doctor, you've no way of knowing whether or not she would have had the same result, i.e. the development of carpal tunnel problems in June of '73 regardless of whether or not she had had the prior surgery, isn't that true? In

[ 185 ]

other words, the automobile accident, or motorcycle accident alone could have been a cause of the symptoms which she complained to you about starting in June and continuing on?

"A.  I think it clouds the issue, yes sir.

"* * * * *

## "QUESTIONS BY THE REFEREE

"Q.  You testified under direct examination that when you examined Colleen in July of 1973, I think it was, July 13, the symptoms she exhibited indicated carpal tunnel syndrome and on further examination you indicated they were directly referable to the accident of November 1st, 1972 with the immediate following symptoms and the surgical intervention required. Is that a fair estimate of your testimony under direct examination?

"A.  I think.

"Q.  Is that a fair estimate?

"A.  Yes sir, okay. Yes sir.

"Q.  That was the time before the subject of an intervening automobile accident had been brought into the picture. Under examination, specifically cross examination, you testified that the fall sustained in that accident to the portions of the right arm or index finger clouded the issue and could produce carpal tunnel syndrome. Is that a fair estimate of your testimony?

"A.  Yes sir.

"Q.  Knowing that now, are you still of the medical opinion that the carpal tunnel syndrome symptoms that you became aware of on July 13, 1973 are still referable to the original injury of November 1, 1972, within a reasonable medical probability?

"A.  I can't say, sir, that in view of the intervening accident that I can say that it's a reasonable medical probability that they are.

"* * * * *

## "RECROSSEXAMINATION

"* * * * *

"Q.  So, when you talked about exacerbation of the pre-existing condition, Doctor, as a result of trauma occurring on May 26, 1973, you are talking about if

something had happened to make the palmar condition of the hand worse, aren't you, not the wrist?

"A.   No sir, I mean that I think that her entire hand was swollen, tender, healing, and that any injury to it could have precipitated carpal tunnel syndrome, entrapment of the ulnar nerve in the Guyons canal, another trigger finger.

"* * * * *

"Q.   Didn't you tell us, already on cross examination, Doctor, that you didn't know whether or not she would have had the carpal tunnel regardless of whether or not she had the surgery or preexisting problems; that she might have had it just as a result of a motorcycle accident?

"A.   Yes sir.

"Q.   Is that still your opinion?

"A.   Yes sir.

"Q.   So you can't tell whether or not it was a factor, isn't this true?

"A.   No sir.

"Q.   Isn't it true that —

"A.   I'm agreeing with you."

Based upon Dr. Harwood's conclusion that the finger problem cannot cause the wrist problem, Dr. Melgard's serious doubt regarding the diagnosis and causal connection and Dr. Ellison's withdrawal of his conclusion when informed of facts which he had not been aware at the time when he opined causality to have existed, we find that claimant has not proved a causal connection between her wrist condition and her earlier injury to and treatment of her finger.

The Fund having prevailed on the cross-appeal, claimant's assignments of error become moot.

Reversed.